IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| SANDRA BOYETT, individually, and as personal representative for the Estate of RAYMOND BOYETT; JESSICA (BOYETT) PETERSON; and BRANDY (BOYETT) SORENSON,<br><br>  Plaintiffs,<br><br><br><br>   vs.<br><br><br>COUNTY OF WASHINGTON, a political subdivision of the State of Utah; WASHINGTON COUNT PURGATORY CORRECTIONAL FACILITY, a political subdivision of the State of Utah; WASHINGTON COUNTY SHERIFF DEPARTMENT; a political subdivision of the State of Utah; KIRK SMITH, Sheriff of Washington County, individually and officially; DESTINY HUMMER; individually and officially; FRED KEIL; individually and officially; RAYMOND J KOUNALIS, individually and officially; GENE REDFORD, individually and officially; SABRINA STEELE, individually and officially, DARRYL McCOY, individually and officially, RANDY McKINNON, individually and officially; DAVE PATT, individually and officially; and DOES 1–10,<br><br>   Defendants. | ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Case No. 2:04cv1173 |

This civil rights case arises out of the tragic death of Raymond Boyett.  Mr. Boyett died while being held as an inmate at a Washington County, Utah, correctional facility.  His estate now seeks damages from various government officials and entities for alleged violations of Mr. Boyett's civil rights under 42 U.S.C. § 1983, and theories of negligence, wrongful death, and infliction of emotional distress.  The plaintiff estate's principal claim is that Mr. Boyett's jailers failed to provide adequate medical care to him, used excessive force, and maintained defective policies, which resulted in a violation of his constitutional rights.

All of the remaining defendants have moved for summary judgment on the plaintiff's claims.  After carefully considering the parties' arguments, the court GRANTS the defendants' motions for summary judgment on all claims against all defendants.  In short, the plaintiff has failed to defeat the individual defendants' claims of qualified immunity by establishing any defendant violated a constitutional right of Mr. Boyett that was clearly established.  No evidence supporting a claim of inadequate training or supervision establishes the claim against Sheriff Smith.  And, with regard to Washington County, the plaintiff has failed to meet the "rigorous standard[]"[1] required for a claim of municipal liability under § 1983 to succeed.

## BACKGROUND

### I.      Factual Background

When considering a motion for summary judgment, the court views the evidence in the

---

[1]*Board of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

light most favorable to the nonmoving party.[2]  Viewed in this light, the record reflects the following facts.

On August 20, 2003, Officer Brent Nelson arrested Mr. Boyett for driving under the influence, driving without insurance, driving on a suspended license, and failing to register his vehicle.  Mr. Boyett had other, similar charges already pending against him from a June 2, 2003, incident.  Before incarcerating Mr. Boyett, Washington County sought and received medical clearance from Dr. Michael Tremea at the Dixie Regional Medical Center.  In the Prisoner Medical Clearance Report, Dr. Tremea listed alcohol intoxication and recent abdominal surgery under "Diagnosis" and recommended Mr. Boyett continue his regular dose of Methadone.  Mr. Boyett was released from custody on August 21, 2003.  Shortly thereafter, Judge James L. Shumate and Judge Eric Ludlow each issued arrest warrants for Mr. Boyett based on the two criminal incidents.  Deputy Laura Stokes arrested Mr. Boyett pursuant to these arrest warrants, on August 27, 2003.  Correctional booking staff members already had notations on file of some of Mr. Boyett's medical history.  Upon being booked, jail officials reviewed Mr. Boyett's medical history with him.  Mr. Boyett stated nothing in his medical history had changed.

On Sunday, August 31, 2003, Mr. Boyett indicated he thought he was bleeding inside due to surgery for a hernia about one month prior.  He complained again about three hours later. James Hanson and Randy McKinnon, licensed practical nurses, responded, evaluated Mr. Boyett, and recorded his complaints, including his complaint that he had spit up blood.  During routine

---

[2]*See Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006).

medical rounds, medical staff again checked on Mr. Boyett that evening.

A Physician's Assistant, Sabrina Steele, evaluated Mr. Boyett on September 1, 2003.  PA Steele works under the supervision of Dr. Bruce Burnham, a physician at the correctional facility in Gunnison, Utah.  PA Steele had no discussions with Dr. Burnham about Mr. Boyett, but Dr. Burnham was available to consult with PA Steele twenty-four hours a day.  During her evaluation of Mr. Boyett, PA Steele requested he advise her of his medical history.  Among other things, Mr. Boyett indicated he suffered from alcohol withdrawal symptoms and he was concerned about healing from his hernia surgery.  PA Steele prescribed 500 mg of Naprosyn twice daily and 25 mg of Elavil twice daily for Mr. Boyett's neck and back pain.  She prescribed 0.1 mg of Clonidine twice daily to treat his Methadone withdrawal.  She ordered liver function tests to be performed on Mr. Boyett and requested followup as needed.  PA Steele advised the medical staff to contact her if they had questions about any of the inmates, including Mr. Boyett.

At 10:38 a.m. on September 2, 2003, jail medical staff saw Mr. Boyett during "inmate sick call."  At 10:26 p.m., medical staff administered prescribed medications to Mr. Boyett.  At 11:30 p.m., Mr. Boyett requested to see medical staff again, complaining his liver was bad. Medical staff was notified, but responded by telling jail officials Mr. Boyett had already been seen and had received his medications.  On September 3, 2003, at about 2:00 a.m., Mr. Boyett complained to jail staff that he suffered from Hepatitis C and his doctor told him he could die at any time.  He also said he had not slept in five days, and he requested to be hooked up to I.V.s. The officer spoke with his commanding officer, and was told Mr. Boyett would have to wait until the morning to speak with the medical staff when they came on duty.

The record shows that during phone calls, Mr. Boyett talked in some detail to his family about various complaints such as falling several times, coughing, and his ears plugging up, but the complaints he relayed to the jail staff were far more sparse.  Mr. Boyett's sister, Judy Brady, sent a letter to the Washington County Attorney's Office, voicing her concern Mr. Boyett may be receiving inappropriate medical care.  Chief of Police Lambert forwarded Ms. Brady's letter to the correctional facility.  In an e-mail to Chief Lambert on September 3, 2003, Nurse Darryl McCoy outlined the medical care of Mr. Boyett to that point.  The e-mail explained Mr. Boyett had been given medication, attended to by PA Steele, and given numerous opportunities to see medical staff.

On September 3, 2003, Mr. Boyett fell near some stairs, and another prisoner notified Fred Keil, a deputy at the facility, of the fall.  Deputy Keil radioed Nurse McCoy and waited with Mr. Boyett until Nurse McCoy arrived.  Nurse McCoy examined Mr. Boyett, treated him for a cut on the arm, and placed him under medical observation for the dizziness he claimed caused his fall.  He also requested the staff on the next medical rounds to assess Mr. Boyett's injury.  On September 3, 2006, at about midnight, Mr. Boyett told an officer he fell again.  The medical technician who responded to evaluate him noted Mr. Boyett described falling, but then denied he had fallen.

On September 4, 2003, Mr. Boyett submitted an inmate request form saying: "I need a request to have my mother's liver transplanted into me and then bury my mother here in

LaVerkin, UT."[3]

On September 4, 2003, Mr. Boyett banged his head on a door throughout much of the swing shift (3:00 p.m. to 11:00 p.m.). Considering this to be dangerous behavior, Nurse Hanson administered 100 mg of Thorazine to Mr. Boyett and ordered Mr. Boyett to be placed in observation. Thorazine is an antipsychotic. It is disputed as to whether PA Steele prescribed the Thorazine by telephone, but this dispute is immaterial because PA Steele indicated she agreed with the administration of Thorazine to Mr. Boyett and the jail staff administered it consistent with a physician's standing orders.

Further, on September 5, 2003, Jon Worlton, a licensed clinical social worker at the jail, examined Mr. Boyett's mental condition at the request of medical staff. After the examination, Mr. Worlton concluded Mr. Boyett was suffering from some psychosis. A three-person team, including Mr. Worlton, ultimately determined Mr. Boyett posed a danger to himself, and antipsychotic drugs should be administered to him for his own protection. Mr. Worlton referred Mr. Boyett to the medical staff for evaluation and possible treatment.

On September 5, 2003, at about 4:49 p.m., Deputy Ray Kounalis noticed a bloody spot on the back of Mr. Boyett's head. Corporal Eugene Redford and Deputy Kounalis accompanied Mr. Boyett to the infirmary to have his injury treated by Nurse Hanson. Mr. Boyett's head injury was the only medical condition requiring treatment of which Deputies Redford and Kounalis were aware. Other than assisting Mr. Boyett in reaching the nursing station, Corporal Redford and

---

[3]Washington County Purgatory Correctional Facility Inmate Request Form, Docket No. 104, Exh. 3.

Deputy Kounalis had no contact with Mr. Boyett during his period of incarceration.  Nurse

Hanson cleaned and treated Mr. Boyett's head injury, reporting that it needed no sutures.  Around

this same time, Nurse Hanson made a note Mr. Boyett had been given 100 mg of Thorazine.  At

7:45 p.m., Nurse Destiny Hummer injected Mr. Boyett with another 100 mg of Thorazine, with

his permission, to help calm him down.

Nurse Hummer checked Mr. Boyett at 12:38 a.m. on September 6, 2003.  Jail records

show other staff members observed him at 1:30 a.m., 2:30 a.m., 3:00 a.m., and 4:00 a.m.  At

about 5:10 a.m., Mr. Boyett was found to be dead.  The next day, on September 7, 2003, Dr.

Edward Leis, a Deputy Chief Medical Examiner for the State of Utah, conducted an autopsy on

the body of Mr. Boyett.  Dr. Leis determined the most significant findings were Mr. Boyett's

occlusive coronary artery disease, cirrhosis of the liver secondary to a Hepatitis C infection, and

alcohol abuse.  In his autopsy report, Dr. Leis noted "Toxicological testing identified no elevated

levels of any medication."[4]  After Mr. Boyett's body had been embalmed, his family hired

another doctor to perform an autopsy.  Dr. John Wallace Graham completed an autopsy on

September 9, 2003.  In his autopsy report, Dr. Graham did not offer any opinions or conclusions

relating to the cause or manner of Mr. Boyett's death.

At the time of Mr. Boyett's death, Kirk Smith held the position of Washington County

Sheriff.  Sheriff Smith was in charge of the correctional facility by virtue of his position, but he

had no involvement with Mr. Boyett or his care or custody.  After Mr. Boyett died, Sheriff Smith

---

[4]Office of the Medical Examiner; Report of Examination, signed by Edward A. Leis (Feb. 5, 2004), Docket No. 104, Exh. 9.

ordered an investigation into his death.  From the evidence to which the parties cited, it is not

clear what, if anything, this investigation revealed about the cause or manner of Mr. Boyett's

death.

## II.    Procedural Background

On December 22, 2004, the plaintiffs filed a complaint alleging a variety of state and

federal causes of action.  The plaintiffs named as defendants Washington County, the

Washington County Sheriff's Office, and several corrections facility and sheriff department

employees in their official and individual capacities.

On March 3, 2005, the defendants answered the plaintiff's complaint and, on March 18,

2005, filed their first motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).[5]

The court granted the motion in part and denied it in part.[6]  The plaintiff stipulated to dismissal

of the first claim against the individually named defendants in their official capacities and of the

second claim against the correctional facility and the sheriff's office.[7]  The court denied the

motion to dismiss the second claim for relief against Sheriff Kirk Smith in his official capacity.[8]

On July 6, 2005, the defendants filed their second motion to dismiss for failure to state a

---

[5]*See* Washington County Defs.' Mot. to Dismiss, Docket No. 8.

[6]*See* Order Granting in Part Washington County Defs.' Mot. to Dismiss, Docket No. 15 (Apr. 12, 2005).

[7]*Id.*

[8]*Id.*

claim pursuant to Rule 12(b)(6).[9]   The court granted the motion, dismissing the state law causes

of action without prejudice.[10]   The defendants then filed a third motion to dismiss pursuant to

Rule 12(b)(6), seeking to dismiss the plaintiffs' claims regarding activities after Mr. Boyett's

death.[11]   The court construed the motion to dismiss as a motion for judgment on the pleadings

and granted the motion.[12]   Because the court dismissed these common law and civil rights claims

of Plaintiffs Sandra Boyett, Jessica (Boyett) Peterson, and Brandy (Boyett) Sorenson, the Estate

of Raymond Boyett stands as sole remaining plaintiff.  On December 11, 2005, Defendant Randy

McKinnon filed a motion for summary judgment, which the court granted.[13]   On December 30,

2005, Defendant Fred Keil filed a motion for summary judgment[14] and on January 11, 2006,

Defendant Jon Worlton filed a motion for summary judgment.[15]   The court granted both

motions.[16]

---

[9]*See* Washington County Defs.' Mot. to Dismiss, Docket No. 19.

[10]*See* Order Granting Washington County Defs.' Mot. to Dismiss, Docket No. 26 (Aug. 24, 2005).

[11]*See* Washington County Defs.' Mot. to Dismiss, Docket No. 28.

[12]*See* Order Granting Washington County Defs.' Mot. to Dismiss, Docket No. 53 (Oct. 25, 2005).

[13]*See* Washington County Defs.' Mot. for Summ. J., Docket No. 66; Order Granting Washington County Defs.' Mot. for Summ. J., Docket No. 98 (Feb. 2, 2006).

[14]*See* Washington County Defs.' Mot. for Summ. J., Docket No. 76.

[15]*See* Washington County Defs.' Mot. for Summ. J., Docket No. 81.

[16]*See* Order Granting Washington County Defs.' Mots. for Summ. J., Docket No. 120 (Apr. 26, 2006).

As a result of these prior motions, the only claims left in this suit are the Estate of Raymond Boyettt's first and second claims for damages under 42 U.S.C. §§ 1983 and 1988 against Washington County, and the following defendants in their individual capacities: Sheriff Kirk Smith, James Hanson, Destiny Hummer, Raymond J. Kounalis, Gene Redford, Sabrina Steele, Darryl McCoy, and Dave Patt.  In this order, the court addresses these defendants' summary judgment motions and various other pending motions.  The court held a hearing on the summary judgment motions on September 28, 2006.

## <u>DISCUSSION</u>

The court first considers the parties' *Daubert* motions, then the plaintiff's general allegations that Mr. Boyett suffered a physical attack.  Next, the court addresses the plaintiff's claims of excessive force against individual defendants, followed by the claims of failure to provide adequate medical care, then the claims against Sheriff Kirk Smith and Washington County.  Finally, the court rules on the plaintiff's Motion to Correct Mistake.

**I.** *Daubert* **Motions and Motions in Limine**

In this case, the plaintiff has lodged extremely serious allegations against the defendants. In particular, the plaintiff alleges that correctional staff raped, beat, and "murdered" Mr. Boyett.[17] These charges must be examined carefully.  On careful examination, however, the support for these charges is utterly non-existent.  Indeed, perhaps heedful of this, the plaintiff spends much of its time arguing the inconsistent theory that Mr. Boyett's death was caused by the provision of

---

[17]*See, e.g.*, Pls.' Mem. in Opp'n to Medical Defs.' Mot. for Summ. J., Docket No. 147, at xlvl, lvi,1.

inadequate medical care.  The only real support for the rape and murder allegations appears in

second-hand, "expert" reports that are not proper evidence.  Recognizing this, the defendants

have filed *Daubert* and Rule 26 challenges to all of the plaintiff's expert witness.  The plaintiff,

in kind, has challenged the defendants' expert witnesses.  The court finds these challenges to be

valid with regard to Dr. William Keith Lara, Dr. Eugene Strayhorn, Dr. Frederick Lovell, Dr. J.

Wallace Graham, and Joseph Kasperick, and strikes these experts' reports and testimony.

It is the job of the trial judge to ensure that any scientific evidence or testimony is both

relevant and reliable, before it is admitted into evidence.[18]  This same gate-keeping function

applies to testimony and evidence based on "technical" and "other specialized" knowledge as

well.[19]  Based on *Daubert*, Rule 702 provides general standards for trial courts to use in assessing

the reliability and helpfulness of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to the
> facts of the case.[20]

In other words, experts must identify the facts and data forming the basis for their testimony so

courts can assess the sufficiency of the facts and data.  And to be admissible, experts must base

---

[18]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

[19]*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

[20]Fed. R. Evid. 702.

their opinions on scientific methods and procedures, not mere subjective belief or unsupported speculation.  In particular, "[w]hen dealing with an issue of medical causation, a considered medical judgment is necessary, expressed in terms of probability rather than possibility."[21]  The court may exclude evidence where it finds "an impermissible analytical gap exists between the premises and conclusion."[22]  And it is the burden of the proponent of the evidence to establish that the requirements for its admissibility have been met, by a preponderance of the evidence.[23]

In this case, the experts' compliance with Rule 26(a)(2)(B)[24] is also at issue.  Rule 26 requires complete disclosure, in an expert witness report provided to all parties, of all opinions an expert will give.[25]  Rule 37 provides an enforcement mechanism for Rule 26.[26]  It provides that parties failing to disclose the information Rule 26(a)(2)(B) requires, "unless such failure is harmless[, . . . are not] permitted to use as evidence at a trial, at a hearing, or on a motion any . . . information not so disclosed."[27]  The court addresses the parties' challenges to one another's experts in light of these factors.

---

[21]*Higgins v. Martin Marietta Corp.*, 752 F.3d 492, 496 (10th Cir. 1985).

[22]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005) (citation and internal quotations omitted).

[23]*See Bourjaily v. Untied States*, 483 U.S. 171, 175 (1983).

[24]Fed. R. Civ. P. 26(a)(2)(B).

[25]*Id.*

[26]*Id.* § 37(c)(1).

[27]*Id.*

*A.     Dr. Strayhorn*

The defendants argue Dr. Strayhorn's testimony is inadmissible because Dr. Strayhorn lacks the qualifications to proffer opinions on forensic pathology, and his opinions lack factual basis.

As an initial matter, the court shares the defendants' concerns about Dr. Strayhorn's qualifications to proffer opinions on forensic pathology matters.  The plaintiff argues Dr. Strayhorn's qualifications affect only the weight to be given to his testimony, not its admissibility.  However, under Rule 702, to proffer expert testimony about a matter, the individual must be qualified.[28]  And qualification of witnesses is a preliminary question for the court.[29]  Even ignoring the glaring fact that Dr. Strayhorn is Mr. Boyett's brother-in-law, the plaintiff's own expert, Dr. Frederick Lovell, testified Dr. Strayhorn is unqualified to render opinions on forensic pathology issues.[30]

Dr. Strayhorn's lack of qualification is only the first problem.  Even if he were fully qualified to opine as to the cause and manner of Mr. Boyett's death, the court must still strike Dr. Strayhorn's reports and affidavit.  At issue are: Dr. Eugene Strayhorn's first report, dated

---

[28]*Id.*

[29]Fed. R. Evid. 104(a).

[30]Reply Mem. in Support of Officer Defs.' Mot. for Summ. J., Docket No. 152, Exh. 4, Lovell Depo. 23–24.

September 25, 2003;[31] Dr. Strayhorn's second report, dated September 15, 2005;[32] and Dr.

Strayhorn's affidavit, which is undated.[33]  To oppose a motion for summary judgment, the non-

moving party must "go beyond the pleadings and 'set forth facts' that would be admissible in

evidence in the event of trial from which a rational trier of fact could find for the non-movant."[34]

Only sworn statements are admissible at trial.[35]

 Dr. Strayhorn submitted neither of his reports under oath, and Dr. Strayhorn was not

deposed.  Because neither of Dr. Strayhorn's reports are contained in sworn affidavits or

accompanied by a declaration that the statements therein are offered under the penalty of perjury,

they cannot affect the defendants' otherwise proper motions for summary judgment.

 This is no mere technical quibble.  The defendants first challenged the plaintiff with

regard to this issue in February 2006.  This challenge provided the plaintiff with notice its

evidence failed to conform to the requirements of the Federal Rules of Civil Procedure, because

the plaintiff had neglected to submit various statements in a manner "as would be admissible in

evidence" at trial.[36]  Since this time, the plaintiff has had numerous opportunities to resubmit its

evidence in the proper form, including at the summary judgment hearing on September 28, 2006,

---

[31]Docket No. 79, Exh. 8.

[32]Docket No. 79, Exh. 13.

[33]Docket No. 79, Exh. 18.

[34]*Alder v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[35]*See* Fed. R. Evid. 602.

[36]*See* Fed. R. Civ. P. 56(e).

but has failed to do so.

Besides this obvious and fatal problem, Dr. Strayhorn's first report is dated only a couple of weeks after Mr. Boyett died, and over a year before the case was filed.  In other words, he reached his report conclusions without the benefit of any of the materials obtained via discovery, many of which may have undermined his original conclusions.  Further, Dr. Strayhorn's first report failed to specifically list the materials he reviewed.  His reference to his "[r]eview of jail log and other documents"[37] is insufficient to inform the court, pursuant to Rule 702, whether his report was based on sufficient facts and data.  In addition, Dr. Strayhorn's unsworn statements fail tests of reliability.  For example, Dr. Strayhorn observed that no records explained the mechanism of injury of Mr. Boyett's omental hematoma.  But this observation was in error.  In an operative report, Dr. Miller, the physician who performed hernia surgery on Mr. Boyett in July 2003, explained the omental bruise resulted from the surgery.  A simple review of the evidence would have explained the existence of this condition.  This failure to review the evidence demonstrates why Dr. Strayhorn's opinions fail the reliability standards of *Daubert* and Rule 702.

Even Dr. Strayhorn's more limited, sworn statement fails due to lack of reliability.  Interestingly, in the only sworn statement Dr. Strayhorn submitted, he retreated from his unsworn claims that Mr. Boyett was "sodomized . . . beaten and murdered."[38]  Instead, Dr. Strayhorn

---

[37]Docket No. 71, Exh. 3.

[38]Docket No. 79, Exh. 8, Strayhorn Report 4.

claimed only that it "constitutes a violation of the standard of medical care and reckless indifference" to fail to medically assess or have a physician assess Mr. Boyett's complaint of internal bleeding.[39]  This statement fails to recount any principles or methods Dr. Strayhorn relied on in reaching his conclusions.  Similar to his first report, Dr. Strayhorn vaguely references jail logs and depositions in his affidavit but neglects to identify which logs and depositions he reviewed or on what he bases his opinion.  This makes it impossible to identify which sources, if any, Dr. Strayhorn relied on to support his claims.  Indeed, the records Dr. Strayhorn reviewed may have omitted a reference to a medical assessment for Mr. Boyett's internal bleeding, but other records may have contained such a reference.

Further, to be admissible, expert opinions must be based on reasonable scientific certainty rather than mere possibility,[40] but Dr. Strayhorn's affidavit evinces speculation.  For example, Dr. Strayhorn stated, "[a]s a medical provider at Purgatory, Nurse McKinnon *would have had* access to the Purgatory medical records."[41]  The highlighted language indicates Dr. Strayhorn was not relying on a source conclusively stating Nurse McKinnon actually did have access to such records, but rather, he was simply speculating.  Impermissibly, he rests his affidavit conclusions, in part, on this speculation.  Finally, nowhere does Dr. Strayhorn claim he made his opinions to a reasonable degree of medical or scientific certainty.

---

[39]Docket 79, Exh. 18, Strayhorn Aff. 2–3.

[40]*Higgins*, 752 F.3d at 496.

[41]Docket No. 79, Exh. 18, Strayhorn Aff. 2 (emphasis added).

Because two of Dr. Strayhorn's statements are unsworn and unreliable, and his only sworn statement fails to meet the reliability standards set out in *Daubert* and Rule 702, the court strikes Dr. Strayhorn's reports and affidavit.

     B.    *Dr. Lara*

The court also finds it necessary to strike Dr. Lara's report and testimony in this case. Dr. Lara submitted a report dated March 28, 2006.[42] Unlike both of Dr. Strayhorn's reports, Dr. Lara submitted this report under the penalty of perjury. He also gave deposition testimony on July 18, 2006. However, like Dr. Strayhorn, Dr. Lara is not a forensic pathologist, which calls into question his qualifications to comment on matters of forensic pathology.

Further, in violation of Rule 26(a)(2)(B), Dr. Lara failed to indicate on what he based his medical opinions.[43] This failure also runs contrary to Rule 702 and *Daubert*,[44] because without information as what underlying evidence Dr. Lara evaluated and relied upon, the court cannot possibly determine if the evidence is sufficient to support his opinion. The plaintiff, in its opposition to the defendants' motion in limine, provided an extensive list of evidence Dr. Lara supposedly reviewed and relied upon. However, Dr. Lara himself never indicated he relied on such evidence — in fact, in his deposition, Dr. Lara plainly stated he had not reviewed much of the material he had been provided. For example, Dr. Lara admitted to not having reviewed the

---

[42]*See* Docket No. 116, Ex.4.

[43]*See* Fed. R. Civ. P. 26(a)(2)(B).

[44]Fed. R. Evid. 702.

Hurricane City police reports, any of the other witnesses' depositions, the pleadings in the case, or any reports from experts other than Dr. Graham.

Dr. Lara's failure to meet the reliability standard for medical testimony, under *Daubert* and Rule 702, is tied to his failure to review the relevant evidence. In his report, Dr. Lara not only neglected to indicate the basis for his opinions, he failed to point to any facts supporting them. For instance, Dr. Lara concluded, without any factual reference, that if Mr. Boyett had "received proper medical care, he would have survived the terrible ordeal he was dealt" and that "[i]t is clearly apparent that [Mr. Boyett] did not die of Coronary Artery Disease."[45] However, nothing in Dr. Lara's report supports these sweeping statements. Similarly, nothing in his report supports his quite serious charge that "more likely than not, [this trauma] was done to [Mr. Boyett] by someone with access to him the night before his death."[46] It is entirely unclear how Dr. Lara could reach this conclusion, to a reasonable degree of medical certainty, when Dr. Leis reached no conclusions even remotely similar. It does not reflect sound scientific principles for Dr. Lara, a non-pathologist who did not examine the record or have the benefit of examining the body, to reach more specific conclusions about Mr. Boyett's alleged attack and attacker than the actual medical examiner — one of only two physicians who physically examined Mr. Boyett's body. This rests in the realm of speculation, not reasonable scientific certainty.

Dr. Lara's deposition fails to cure the deficiencies in his report. In fact, Dr. Lara's

---

[45]Docket No. 116, Ex. 4, at 2.

[46]*Id.*

deposition only bolsters the court's decision to strike his testimony.  For one thing, in his deposition, Dr. Lara admitted he has no idea how the injuries to Mr. Boyett were caused.  For another thing, in his report and his deposition, Dr. Lara advanced detailed opinions about Mr. Boyett's alleged oversedation and how this oversedation violated the medical standard of care and contributed to Mr. Boyett's demise.  But Dr. Lara knew nothing of the levels of medications in Mr. Boyett's blood stream or of his blood culture results.  He never saw the toxicology report from Mr. Boyett's autopsy, although he admitted the report would be important in order to form opinions with regard Mr. Boyett's level of sedation.  Even though he was completely unaware of the results of the toxicology report — a report that showed Mr. Boyett had no elevated levels of any medication — Dr. Lara concluded Mr. Boyett had been oversedated.  This can only qualify as uninformed speculation.

Similarly, Dr. Lara made no attempt to support the other conclusions in his report with actual evidence from the case.  For example, as a basis for his statement that Mr. Boyett had not died of coronary artery disease, Dr. Lara explained that in the case of a heart attack, there is evident necrosis of cells, but there was no such evidence in Mr. Boyett's case.  However, in Dr. Leis' deposition (which Dr. Lara had not reviewed), he explained that Mr. Boyett died within minutes of his arrhythmia onset, and Dr. Anderson, the defendants' cardiology expert, explained Mr. Boyett died so quickly, no heart damage occurred.  Further, a report of a plaintiff expert (which Dr. Lara also had not reviewed), explained Mr. Boyett's death resulted from "cardiac

arrest."[47]  Finally, Dr. Lara's testimony undercut his own conclusions in his report.  For instance, in his deposition, Dr. Lara explained that when he wrote that correctional staff had acted deliberately indifferent to Mr. Boyett's medical needs, he meant only that they had been medically negligent.

To be sure, scientific experts may differ on such subjects as these.  But here, put simply, Dr. Lara offered no evidentiary basis for his opinions and no methodology or principles on which he based his opinions.  This proves fatal to his report and testimony.  Because Dr. Lara points to no evidence to support his conclusions about the cause and manner of Mr. Boyett's death, his opinions about Mr. Boyett surviving if he had received appropriate treatment are speculative and irrelevant.  The court, therefore, finds it necessary to strike Dr. Lara's report and testimony pursuant to *Daubert*, Rule 702,[48] and Rule 26(a)(2)(B).[49]

C.      *Dr. Lovell*

The court must strike Dr. Lovell's report and testimony for reliability reasons as well. Unlike Dr. Strayhorn and Dr. Lara, Dr. Lovell at least identified the materials on which he relied in reaching his conclusions.  But Dr. Lovell failed to set forth specific facts to support his conclusions, and his conclusions only rose to the level of possibility, not probability.[50]

Dr. Lovell's deposition testimony violates Rule 26 because in his deposition, Dr. Lovell

---

[47]*See* Docket No. 184, Ex. A, Lovell Report 6.

[48]Fed. R. Evid. 702.

[49]Fed. R. Civ. P. 26(a)(2)(B).

[50]*See Higgins*, 752 F.3d at 496.

proffers opinions on issues never disclosed previously.  For example, only in his deposition does Dr. Lovell address the possibility of Mr. Boyett suffering seizures.  This is problematic due to lack of disclosure and because no admissible evidence supports a theory that Mr. Boyett suffered from seizures.  A comment by Dr. Lies constitutes the only evidence at issue in the summary judgment motions that Mr. Boyett suffered from seizures.  In his deposition, Dr. Leis indicated that Shane Copeland, a Hurricane, Utah, police officer, spoke to some inmates after Mr. Boyett's death.  The inmates allegedly advised Officer Copeland that Mr. Boyett shook after he fell down the stairs.  This information, hearsay within hearsay, is inadmissible evidence.  Not only does Dr. Lovell's deposition testimony about seizures violate Rule 26, without any further evidence of Mr. Boyett suffering from seizures at the jail, Dr. Lovell's theories on the matter constitute speculation — and speculative expert testimony is inadmissible.

Dr. Lovell's other conclusions are also too speculative to constitute reliable medical opinions.  Dr. Lovell's statements in his deposition undercut any semblance of reliability in his report.  For example, in his report, Dr. Lovell questioned whether Mr. Boyett's blocked artery had contributed to his demise.  But in his deposition, Dr. Lovell acknowledged that Mr. Boyett's left anterior descending artery — an artery Dr. Lovell said is called the "widowmaker" — was ninety percent occluded.  Dr. Lovell also indicated that even a seventy percent occlusion can result in instant death.  Dr. Lovell's other theories are similarly unreliable — his own statements undermine his conclusions.  For instance, Dr. Lovell argued Mr. Boyett's anal laceration "was undoubtedly penetration with a blunt foreign body," and his head injury was likely caused by "an

external blow."[51]  Yet in the very same report, Dr. Lovell stated with regard to Mr. Boyett's

injuries, that "it is difficult to fin[d] documentation as to exactly when and how these

occurred."[52]  It is not clear how Dr. Lovell can note the lack of information as to the injuries in

one breath then proffer theories as to the "undoubted[]" cause in the next.[53]  This approach

reveals the suppositional nature of his conclusions.  Similarly suppositional is Dr. Lovell's

conclusion that because Mr. Boyett did not complain of pain to his ribs, his rib fractures

"probably occurred near the end of his life."[54]  Even if Dr. Lovell had not added the prominent

qualifier, "probably," which undercuts the conclusive nature of his statement, his statement fails

to assist the trier of fact.  It does not provide a specific enough time frame to implicate any

particular individuals, and it does not describe a mechanism of injury.  Dr. Lovell's deposition

testimony that the defendants' actions constituted negligence is irrelevant as well, as negligence

is not at issue in this case — negligence fails to rise to a § 1983 violation.[55]

> Because the conclusions in Dr. Lovell's report and testimony are too speculative to meet

the requirements of Rule 702 and *Daubert*, the court finds it necessary to strike these statements.

> D.     *Dr. Graham*

> Dr. Graham's second report must be stricken, as Dr. Graham never declared it was

---

[51]Docket No. 116, Exh 4, Lovell Report 5.

[52]*Id.*

[53]*Id.*

[54]*Id.*

[55]*Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

offered under the penalty of perjury.  The party opposing a summary judgment motion must

present evidence that would be admissible at trial[56] — only sworn statements are admissible.[57]

Because Dr. Graham's second report is not contained in a sworn affidavit or accompanied

by a declaration that the statements therein are offered under the penalty of perjury, it cannot

affect the defendants' proper motions for summary judgment.  Again, this is no mere technicality,

but an important check on scurrilous unsworn allegations, as the facts of this case reveal.

Initially, the plaintiff even submitted Dr. Graham's autopsy report as an unsworn report, but on

July 20, 2006, the plaintiff re-submitted this report, accompanied by an affidavit declaring the

statements it contained to be true.[58]  The court finds it interesting that Dr. Graham's sworn

statement only includes his autopsy report — not his second report, which contained potentially

inflammatory statements not found in his autopsy report.  For instance, only in the unsworn,

second report did Dr. Graham indicate that air in Mr. Boyett's scrotum may have resulted from

an anal laceration.

For purposes of this summary judgment order, therefore, the court cannot consider Dr.

Graham's unsworn second expert statement.  The court only considers the findings set forth in

Dr. Graham's autopsy report and addendum.  Because this order disposes of the plaintiff's

claims, the court does not reach the parties' dispute as to the appropriateness of Dr. Graham

---

[56]*Alder*, 144 F.3d at 671.

[57]*See* Fed. R. Evid. 602.

[58]*See* Docket No. 148, Exh. 22.

offering opinions at trial that fall outside of the objective findings in his autopsy report.

       E.    *Other* Daubert *Motions*

The remainder of the parties' *Daubert* motions and motions in limine require no extensive discussion. Briefly, in addition to the previously-discussed experts, the defendants challenged the testimony of Joseph E. Kasperick and Roger Clark. For its part, the plaintiff challenged the statements of Dr. Edward Lies and Rudy Riet. The plaintiff failed to even object to the defendants' challenge to Mr. Kasperick. The court, therefore, grants the defendants' motion as to Mr. Kasperick and strikes his testimony.

The court cannot strike the testimony of Dr. Leis, however. The plaintiff argued Dr. Leis' trial testimony should be stricken because the defendants failed to designate Dr. Leis as an expert in accordance with Rule 26. In its motion, the plaintiff only challenged Dr. Leis' possible trial testimony based on lack of Rule-26 notice, not the validity of Dr. Lies' report or opinions. However, the plaintiff's notice argument fails because the plaintiff's own initial disclosures listed Dr. Lies as someone with knowledge of Mr. Boyett's death — obviously the plaintiff was not prejudiced by the lack of disclosures.

Even if the lack-of-notice argument were valid, the plaintiff's challenge would fail because Dr. Lies falls outside the scope of Rule 26. The defendants did not retain or employ Dr. Lies in any fashion. Instead, Dr. Leis' involvement in the case came about by virtue of his job as State Medical Examiner. With regard to Mr. Boyett, Dr. Leis simply performed his legal duty, which includes certifying the cause and manner of death of certain individuals. Because of Dr. Lies' status as an independent medical examiner, either side could call him as a "fact" witness —

i.e., as an eyewitness to facts which are in dispute about the nature of the medical examination. In fact, the plaintiff relied on Dr. Lies' statements and report in opposing the defendants' motions for summary judgment.  Because the plaintiff made only a Rule 26 challenge to Dr. Leis' testimony and Dr. Lies falls outside the scope of Rule 26, there is no basis to strike his testimony.

The court need not address the admissibility of the statements of Mr. Clark or Mr. Riet because neither party relied on any statements of Mr. Clark or Mr. Riet in the summary judgment motions.  And the court has not gone outside the motion evidence to consider any of Mr. Clark's or Mr. Riet's statements.  As a practical matter, therefore, it is unnecessary for the court to address these motions.

In sum, because they fail to meet the reliability requirements of *Daubert* and Rule 702, the court must strike the reports and testimony of Dr. Lara and Dr. Lovell, and the affidavit of Dr. Strayhorn.  The court cannot consider either of Dr. Strayhorn's reports or Dr. Graham's second report for purposes of summary judgment — despite the plaintiff's many chances to cure this problem, all three of these reports remain unsworn.  Further, as the plaintiff neglected to oppose the defendants' challenge to Mr. Kasperick's testimony, the court strikes his statements.  Finally, as Dr. Leis falls outside the scope of Rule 26, the court finds no basis for striking his statements.

## II.    Allegations of Physical Attack

The expert reports, which fail to qualify as admissible evidence, constitute the only real support for the plaintiff's allegations of rape, assault, and murder.  Even if this evidence were properly before the court, it provides little support for the premise that Mr. Boyett suffered some sort of physical attack and no support for the premise that the defendants had any connection to

any attack.  In brief, the plaintiff has failed to identify an attacker or specify what acts by this unknown attacker caused Mr. Boyett's injuries, or how, or when, or where.

Although the plaintiff did not primarily cite to Dr. Lovell's or Dr. Lara's reports in support of its claim of physical assault, out of an abundance of caution, the court reviewed these reports and found some evidence provisionally supporting a theory of physical attack.  For instance, Dr. Lara concluded it was unlikely Mr. Boyett caused his own broken ribs or anal laceration.  And Dr. Lovell argued the anal laceration "was undoubtedly penetration with a blunt foreign body," and the head injury was likely caused by "an external blow."[59]  He offered no opinion as to the cause of the rib fractures.

Even if this evidence were admissible, the plaintiff's § 1983 claim based on a physical attack of Mr. Boyett would fail.  The fatal flaw in the plaintiff's claim, as in the Tenth Circuit case of *Barney v. Pulsipher*,[60] is the lack of an affirmative link to corrections officials.  In *Barney*, the plaintiff filed suit pursuant to § 1983, against Gerald Pulsipher, a corrections officer, the sheriff of the Box Elder County Sheriff's Office, and three county commissioners who were responsible for the jail.[61]  The Tenth Circuit reviewed the district court's grant of summary judgment to the sheriff and the commissioners.  While Ms. Barney was confined in the Box Elder jail serving a forty-eight hour sentence, Mr. Pulsipher took Ms. Barney to an unmonitored area of

---

[59]Docket No. 116, Exh 4, Lovell Report 5.

[60]143 F.3d 1299 (10th Cir. 1998).

[61]*Id.* at 1305–06.

the jail, in violation of jail policy, and sexually assaulted her.[62]  Within the same general time

frame, Mr. Pulsipher had sexually assaulted another female inmate in much the same manner.[63]

The sheriff's office had hired Mr. Pulsipher pursuant to its standard procedures, and Mr.

Pulsipher had completed the requisite training to become a correctional officer.[64]  The sexual

assaults perpetrated by Mr. Pulsipher were the only incidents of sexual misconduct of which the

sheriff or commissioners were aware.[65]  The court concluded the defendants could not face

municipal liability — liability in their official capacities — because they had no notice of a

pattern of violations or a deficient training program.[66]  Similarly, apart from the claims against

Mr. Pulsipher, the court denied Ms. Barney's claims against all defendants based on individual

liability.  Absent evidence of prior sexual misconduct by Mr. Pulsipher or previous sexual

assaults by other Box Elder jailers, the court could not find the sheriff or commissioners acted

with deliberate indifference toward Ms. Barney.[67]  The court clarified that even the "inexcusable

and outrageous" behavior of Mr. Pulsipher was insufficient to impose liability on the

municipality, the sheriff, or the commissioners.[68]

---

[62]*Id.* at 1305.

[63]*Id.* at 1304–05.

[64]*Id.* at 1305.

[65]*Id.* at 1306.

[66]*Id.* at 1307–08.

[67]*Id.* at 1312.

[68]*Id.* at 1313.

In *Barney*, the plaintiff established who perpetrated the offense, what the act consisted of, when it occurred, where it occurred, and who else was involved.  Yet even in the face of these details about the egregious acts by Mr. Pulsipher, the court affirmed summary judgment for the defendants based on the lack of connection between corrections officials and the abuse.  In this case, the plaintiff has built ill-defined claims that Mr. Boyett was physically abused solely on injuries discovered only after Mr. Boyett's death.  There is such a dearth of evidence supporting this theory that in its pleadings, the plaintiff failed to even make specific *allegations* — let alone produce evidence — as to who abused Mr. Boyett, what exactly occurred, when it occurred, or who else was involved.  Other than broad, general claims of "correctional staff" perpetrating unspecified abuses, the plaintiff failed to craft a physical attack allegation at all.  Not only does this prevent the court from tying the alleged abuses Mr. Boyett suffered to a specific perpetrator, it frustrates any attempt to connect corrections officials to the alleged abuse.

The court cannot find any exceptions to the fatal nature of this flaw in the plaintiff's claims of physical abuse.  Therefore, the court turns to the issues the plaintiff presented that are worthy of more extended discussion — the substantive claims against individuals of failure to provide adequate medical care, supervisory liability, and municipality liability.

## III.   Claims Against Individual Officers — Excessive Force and Inadequate Medical Care

### A.   *Qualified Immunity Standard*

In response to the plaintiff's § 1983 allegations, the individual defendants have invoked the defense of qualified immunity.  Actions for damages provide an important remedy for those

injured by abuse of governmental authority, but such actions also have potential to subject officials to harassing, costly litigation and to inhibit performance of their duties.[69]  The affirmative defense of qualified immunity balances these competing interests by protecting "all but the plainly incompetent or those who knowingly violate the law."[70]  Government officials are entitled to qualified immunity "in all but the most exceptional cases."[71]  Whether qualified immunity exists is a "purely legal question."[72]

Due to the underlying purposes of qualified immunity, courts evaluate summary judgment motions in qualified immunity cases differently than general summary judgment motions.[73]  After a defendant asserts a qualified immunity defense, the plaintiff has the burden of satisfying a two-part test.[74]  As part of this "heavy two-part burden,"[75] the plaintiff must establish the defendant's acts or omissions violated a constitutional or statutory right.[76]  Next, the plaintiff must show the right at issue was clearly established at the time of the defendant's unlawful conduct.[77]  In

---

[69]*Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

[70]*Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[71]*Tonkovic v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998).

[72]*Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

[73]*Nelson v. McMullen*, 207 F.3d 1202, 1205–06 (10th Cir. 2000).

[74]*Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000).

[75]*Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995).

[76]*Id.*

[77]*Id.*

assessing whether a right was clearly established, the court must look at the objective legal reasonableness at the time of the challenged action and ask if "the right [was] sufficiently clear that a reasonable officer would understand that what he [was] doing violate[d] that right."[78]  If the plaintiff fails to satisfy any part of the inquiry, the court must grant qualified immunity to the defendants.[79]

If, however, the plaintiff succeeds in establishing a violation of a clearly established right, the defendant has the burden to prove "there are no genuine issues of material fact and he or she is entitled to judgment as a matter of law."[80]  Although the court views the evidence in the light most favorable to the nonmoving party, the record must clearly establish the plaintiff has satisfied its heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.[81] In this case, the plaintiff has not met its heavy burden, so the court must grant qualified immunity to the defendants.

B.    Excessive Force

The plaintiff alleges Deputy Kounalis and Corporal Redford should face § 1983 liability for using excessive force on Mr. Boyett.  Use of excessive force violates the Eighth Amendment's prohibition against cruel and unusual punishment,[82] and due process requires the

---

[78]*Wilson v. Layne*, 526 U.S. 603, 615 (1999).

[79]*Albright*, 51 F.3d at 1535.

[80]*Id.* (citing *Hinton v. City of Elwood*, 997 F.2d 774, 779 (10th Cir. 1993)).

[81]*Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

[82]*Norton v. City of Marietta*, 432 F.3d 1145, 1154 (10th Cir. 2005).

Eighth Amendment standard be applied to pretrial detainees, not just those adjudicated guilty.

To succeed on an excessive force claim, the plaintiff must show (1) objectively, the alleged bad

act was harmful enough to establish a constitutional violation, and (2) the defendants acted with a

sufficiently culpable *mens rea*.[83]  "The objective component . . . is contextual and responsive to

contemporary standards of decency.  The subjective element . . . turns on whether force was

applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for

the very purpose of causing harm."[84]

 In this case, there is contested evidence as to whether force was used on Mr. Boyett at all.

However, this dispute is immaterial because even if the court accepted the assertion that force

was used on Mr. Boyett, there is only attenuated circumstantial evidence the force occurred at the

hands of either Corporal Redford or Deputy Kounalis.  However, at the summary judgment

hearing on September 28, 2006, plaintiff's counsel presented an elaborate theory relating to the

cause of Mr. Boyett's head injury.  Specifically, counsel speculated Deputy Kounalis entered the

room where Mr. Boyett was being held.  He saw Mr. Boyett making a phone call, which Mr.

Boyett had allegedly been forbidden to do.  Because Deputy Kounalis suspected Mr. Boyett was

calling his family to complain about his medical care, he hit Mr. Boyett on the head with the

phone.  Before presenting this theory, plaintiff's counsel conjectured that Mr. Boyett already

suffered from broken ribs by the time he taken from this room to the infirmary.  Considering that

---

[83]*Id.*

[84]*Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003).

in its pleadings, the plaintiff repeatedly referred to Deputy Kounalis' statement hat he had used "knee strikes" — a control technique — on inmates before, plaintiff's counsel seemed to be implying Deputy Kounalis had also broken Mr. Boyett's ribs at this time.

The only admissible evidence in support of the plaintiff's claim of force is: (1) the autopsy of Mr. Boyett's body revealed broken ribs and a superficial head laceration, (2) the cause of these injuries is unexplained, (3) Deputy Kounalis spent a few moments alone with Mr. Boyett during his "head count," (4) the first person who noticed Mr. Boyett's head injury was Deputy Kounalis. To allow the plaintiff to argue its excessive force theory to a jury based only on this evidence would stand contrary to qualified immunity principles as a whole, as well as the need for actual evidence to oppose summary judgment motions.

The fact that the injuries "had to have happened somehow"[85] and Deputy Kounalis had a brief chance to cause them is insufficient for a reasonable trier of fact to find Deputy Kounalis actually caused the injuries. Deputy Kounalis maintained Mr. Boyett exhibited the head injury before he entered Mr. Boyett's cell, and he had no knowledge of the rib injury. He repeatedly denied having caused Mr. Boyett's head injury or having any knowledge of how it occurred. Other than to guide Mr. Boyett to the infirmary with Corporal Redford's assistance, Deputy Kounalis vowed he never physically touched Mr. Boyett. The plaintiff offers only wild speculation to counter this evidence, pointing out there is no evidence Deputy Kounalis did *not* injure Mr. Boyett. This kind of "guilty until proven innocent" argument cannot defeat summary

---

[85] Pl.'s Mem. in Opp'n to Officer Defs.' Mot. for Summ. J., Docket No. 148, Exh. 9, Kounalis Depo. 53.

judgment.  That Deputy Kounalis used force is but one of many possible explanations for Mr. Boyett's injury.  It is at least as likely that another inmate caused it.  And perhaps the most reasonable inference is that Mr. Boyett — who had banged his head on the wall of his cell throughout much of a shift the prior day — caused the injury to himself.  In short, there is insufficient evidence for the court to link these injuries to any particular perpetrator.

Even assuming the court agreed the evidence showed Deputy Kounalis caused the injury to Mr. Boyett, the evidence would still be insufficient to establish a § 1983 violation based on excessive force.  The plaintiff has failed to meet its burden to provide evidence suggesting the injury was maliciously caused for the purpose of causing harm as opposed to for the purpose of maintaining discipline.[86]

There is no evidence Corporal Redford spent any time alone with Mr. Boyett, so the excessive force claim is even weaker as pertains to him.  And although the plaintiff alleges Mr. Boyett suffered a litany of other injuries, the plaintiff has failed to provide any evidence — even circumstantial — any of them were at the hands of Corporal Redford or Deputy Kounalis.  The plaintiff's claims of excessive force, therefore, fail as to Corporal Redford and Deputy Kounalis.  Just as the plaintiff has failed to provide evidence supporting § 1983 liability based on excessive force, it has failed to establish liability for the alleged provision of inadequate medical care.

C.     *Deliberate Indifference to Medical Needs*

The plaintiff has failed to present evidence sufficient for a jury to reasonably hold any of

---

[86]*See Cochran*, 339 F.3d at 1212.

the individual defendants liable for the alleged inadequate medical care of Mr. Boyett.  The government has an "obligation to provide medical care for those whom it is punishing by incarceration."[87]  Deficient medical care may constitute a constitutional violation — "deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment."[88]  Although the Eighth Amendment only applies after an inmate has been adjudicated as guilty, due process requires the same standards be applied to pretrial detainees.[89]

Deliberate indifference involves both an objective and a subjective component.[90]  If the medical deprivation is "sufficiently serious," it meets the objective component.[91]  "[A] medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[92]  The subjective component requires a *mens rea* on par with criminal recklessness.[93]  The plaintiff must establish both that the official knew of an "an excessive risk to

---

[87]*Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

[88]*Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

[89]*See Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985).

[90]*Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

[91]*Farmer*, 511 U.S. at 834.

[92]*Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

[93]*Farmer*, 511 U.S. at 836.

inmate health or safety" and that the official disregarded this risk.[94]  It is not enough that the

official *should* have known of the potential harm; the "official must both be aware of the facts

from which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference."[95]  "If an official is aware of the potential for harm but takes

reasonable efforts to avoid or alleviate that harm, he bears no liability under this standard."[96]

Further, officials' knowledge will not necessarily be inferred even in the face of what seems to be

an obvious risk.

> Prison officials . . . might show, for example, that they did not know of the
> underlying facts indicating a sufficiently substantial danger and that they
> were therefore unaware of a danger, or that they knew the underlying facts but believed
> (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or
> nonexistent.[97]

"[S]ummary judgment is appropriate where there is a lack of personal participation or knowledge

of a plaintiff's alleged serious medical need."[98]

The Tenth Circuit case of *Sealock v. Colorado*[99] is instructive here.  In *Sealock*, a prisoner

who suffered a heart attack while incarcerated sued prison officials pursuant to § 1983 for failure

---

[94]*Id.* at 837.

[95]*Id.*

[96]*Despain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001).

[97]*Farmer*, 511 U.S. at 844.

[98]*Bafia v. Bd. of County Commr's*, 2006 U.S. Dist. LEXIS 14347, *42–43 (D. Colo. Mar. 17, 2006) (citing *Worrell v. Henry*, 219 F.3d 1197, 1214 (10th Cir. 2000)).

[99]218 F.3d 1205 (10th Cir. 2000).

to provide adequate medical care.[100]  Throughout the course of a night, the inmate summoned

numerous correctional officers, reporting pain in his chest, trouble breathing, and vomiting.[101]

Correctional staff repeatedly told the inmate he would have to wait until morning because no

medical personnel were on staff at that hour.[102]  In the morning, a nurse examined the inmate and

told him he just had the flu.[103]  The nurse claimed she then spoke to the physician's assistant and

relayed the inmate's symptoms, including "throbbing pressure pain in chest and throat."[104]  The

physician's assistant testified he never heard the report of chest pain, claiming that if he had, he

would have called an ambulance.[105]  The court determined the corrections officials, including the

nurse, lacked deliberate indifference.[106]  However, the court remanded the case with regard to the

liability of the physician's assistant — the trial court needed to assess his knowledge.[107]  The

Tenth Circuit concluded that unless the physician's assistant "knew that [the prisoner] had

unexplained chest pain" his actions do not constitute deliberate indifference but, rather, mere

---

[100]*Id.* at 1209.

[101]*Id.*

[102]*Id.* at 1208.

[103]*Id.*

[104]*Id.*

[105]*Id.*

[106]*Id.* at 1211.

[107]*Id.* at 1212.

medical malpractice or negligence.[108]

As with *Sealock*, the plaintiff has failed to show any of the defendants had knowledge of Mr. Boyett's serious medical conditions or that their actions constituted anything other than medical malpractice, at most.

### 1.    Defendant Eugene Redford

The claim against Corporal Redford fails for lack of evidence of deliberate indifference. Corporal Redford's only contact with Mr. Boyett occurred on September 5, 2003.  Deputy Kounalis noticed a bloody spot on the back of Mr. Boyett's head, so he called for the assistance of his supervisor, Corporal Redford.  Corporal Redford accompanied Mr. Boyett to the infirmary but had no other contact with Mr. Boyett.  This evidence does not show deliberate indifference by Corporal Redford; he did not stand by and ignore a serious medical need of which he was aware.  First, the head injury fails to qualify as a serious medical need.  Corporal Redford said he "guess[ed]" Mr. Boyett's head laceration was "maybe" a serious medical injury.[109]  However, Corporal Redford lacked medical training to even make such a determination.  Nurse Hanson, who treated the injury, found no need for sutures.  And although Dr. Leis, reviewing the injury with the benefit of hindsight, expressed an opinion it should have been sutured, he also classed the injury as "superficial."  A superficial head injury, even one requiring sutures, does not qualify as a serious medical need.  Next, even if it were a serious medical need, Corporal Redford acted

---

[108]*Id.* at 1211–12.

[109]Pl.'s Mem. in Opp'n to Officer Defs.' Mot. for Summ. J., Docket No. 148, Exh. 2, Redford Depo. 129.

in a manner establishing he was not deliberately indifferent — he took a patient requiring

medical care to the infirmary to have his injury treated by medical staff.  To ask Corporal

Redford to second-guess the medical opinion of Nurse Hanson regarding the need for sutures

asks too much.

    The plaintiff implies Corporal Redford possessed knowledge of additional injuries of Mr.

Boyett, such as his broken ribs and anal laceration.  However, this fails to support a finding of

deliberate indifference because Corporal Redford first became aware of the additional injuries

long after Mr. Boyett's death — an FBI agent informed him of the injuries at that time.  At the

time of Mr. Boyett's incarceration, Corporal Redford only knew of Mr. Boyett's head injury, but

no other injuries or medical conditions.  Therefore, Corporal Redford was unaware of an actual

danger and did not even know of "underlying facts indicating a sufficiently substantial

danger."[110]  Based on this, a reasonable juror could not find Corporal Redford was deliberately

indifferent to Mr. Boyett's medical needs.

### 2.    Defendant Raymound Kounalis

    As with Corporal Redford, a factfinder could not infer from the evidence that Deputy

Kounalis acted with deliberate indifference to Mr. Boyett's medical needs.  Deputy Kounalis'

only contact with Mr. Boyett consisted of noticing a bloody spot on his head and some blood on

his back during a "head count," and helping Corporal Redford take Mr. Boyett to infirmary.  Mr.

Boyett's head injury was the only medical condition requiring treatment of which Deputy

---

[110]*Farmer*, 511 U.S. at 844.

Kounalis was aware and, as discussed previously, it was not sufficiently serious to fall within the purview of § 1983 liability for deficient medical care.  Also, like Corporal Redford, Deputy Kounalis acted reasonably, considering the extent of his knowledge, by taking Mr. Boyett to the infirmary.  And like Corporal Redford, Deputy Kounalis cannot be held liable for Mr. Boyett's additional injuries and conditions, which he had no reason to suspect.

### 3.    Defendant James Hanson

Nurse Hanson's actions do not reveal deliberate indifference to Mr. Boyett's medical needs either.  Of Nurse Hanson's extensive contact with Mr. Boyett, the plaintiff only challenges Nurse Hanson's treatment of Mr. Boyett's head injury and his administration of Thorazine to Mr. Boyett.  As discussed previously, Mr. Boyett's "superficial" head injury did not constitute a serious medical need.  Further, Nurse Hanson treated the injury as soon as he was made aware of it.  He cleaned and evaluated the wound and found sutures to be unnecessary.  Dr. Leis' difference in opinion as to the need for sutures is immaterial to the inquiry, as a difference in medical opinion does not constitute deliberate indifference.[111]

On September 4, 2003, after Mr. Boyett banged his head on the door throughout much of the swing shift, Nurse Hanson determined Mr. Boyett was exhibiting "dangerous behavior."[112] Based on this conclusion, Nurse Hanson administered Thorazine to Mr. Boyett and placed him

---

[111]*See Estelle*, 429 U.S. at 107; *see also Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999).

[112]Pl.'s Mem. in Opp'n to Medical Defs.' Mot. for Summ. J., Docket No. 147, at xxx–xxxi.

under observation.  After Nurse Hanson treated Mr. Boyett's head injury on September 5, 2003,

he injected Mr. Boyett with another 100 mg of Thorazine to prevent him from harming himself.

The plaintiff has not shown these acts constitute deliberate indifference to Mr. Boyett's serious

medical needs.  The court has already determined administering Thorazine to Mr. Boyett did not

violate his civil rights.[113]  Although PA Steele did not specifically prescribe this medication to

Mr. Boyett, she was "okay" with it being administered to him: "in the situation that he was in,

they were following the protocol and he fit the protocol."[114]  PA Steele indicated giving

Thorazine pursuant to this protocol met the standard of care, even if she personally did not agree

with the protocol itself.[115]  Thus, with regard to this claim, the plaintiff has not established Nurse

Hanson's actions constituted negligence, let alone that he had a "state of mind more blameworthy

than negligence."[116]

Nurse Hanson's only other contact with Mr. Boyett consisted of multiple checks on Mr.

Boyett during medical rounds and in response to Mr. Boyett's requests to see medical staff.

However, the evidence does not show Nurse Hanson possessed any knowledge of Mr. Boyett's

other alleged injuries or conditions.  Mr. Boyett never complained of problems from which an

inference could be drawn that he suffered from other medical conditions.  Further, there is no

---

[113]*See* Order Granting Washington County Defs.' Mots. for Summ. J., Docket No. 120, at 11 (Apr. 26, 2006).

[114]Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., Docket No. 148, Exh. 5, at 79–80.

[115]*Id.* at 73.

[116]*Farmer*, 511 U.S. at 835.

evidence Mr. Boyett exhibited other symptoms indicating these conditions.  Similar to the

medical providers in *Sealock*, unless Nurse Hanson knew of a symptom, such as chest pain, that

would result in substantial harm, he was not deliberately indifferent to Mr. Boyett's medical

needs by delaying or denying treatment for the condition.  Put simply, the plaintiff has not shown

Nurse Hanson learned of and then "disregard[ed] an excessive risk to [Mr. Boyett's] health or

safety.[117]

Based on these undisputed facts, the plaintiff has not satisfied the components of the

deliberate indifference inquiry with regard to Nurse Hanson.

### 4.      Defendant Destiny Hummer

The plaintiff has also failed to show Nurse Hummer's actions constituted deliberate

indifference to Mr. Boyett's medical needs.  Nurse Hummer's only challenged contact with Mr.

Boyett consisted of injecting him with Thorazine.  However, this evidence is insufficient to

establish deliberate indifference to Mr. Boyett's serious medical needs.  On September 5, 2003,

at 7:45 p.m., Ms. Hummer injected Mr. Boyett with 100 mg of Thorazine, with his consent, to

help calm him down.  In administering Thorazine, Nurse Hummer followed the same medical

protocol Nurse Hanson followed.  The plaintiff specifically challenges the administration of this

dose by pointing out Nurse Hummer gave it to Mr. Boyett within less than six hours of his prior

dose.  However, even if this were shown to be in error, at most, this error constitutes medical

---

[117]*See id.* at 837.

negligence, which does not equate to a civil rights violation.[118]  Further, even if this error had

risen to the level of a constitutional injury, the plaintiff has failed to produce evidence this act

caused Mr. Boyett substantial harm.  Although the exact cause of Mr. Boyett's death is disputed,

it is undisputed that in the autopsy of his body, Dr. Leis found no elevated levels of any

medication, including Thorazine.  Nurse Hummer's only other contact with Mr. Boyett consisted

of routine medical checks and responses to his requests to be seen by medical staff.  Similar to

Nurse Hanson, the evidence does not show Nurse Hummer possessed any knowledge of Mr.

Boyett's other alleged injuries or conditions such that she could face liability for not addressing

them.

As there is no evidence Nurse Hummer's actions violated Mr. Boyett's constitutional

rights or caused Mr. Boyett substantial harm, the plaintiff's claim against Nurse Hummer fails.

### 5.   Defendant Darryl Tracy McCoy

The plaintiff has also failed to show Nurse McCoy's actions demonstrate deliberate

indifference to Mr.Boyett's medical needs.  Mr. McCoy's only challenged contact with Mr.

Boyett consisted of his treatment of Mr. Boyett after Mr. Boyett fell.  On September 3, 2003, Mr.

Boyett fell near some stairs.  Nurse McCoy responded, after Deputy Keil notified him of the fall

by radio.  Nurse McCoy examined Mr. Boyett and treated him for a cut on the arm.  He requested

the staff on the next medical rounds to assess Mr. Boyett's injury, and he placed Mr. Boyett

under medical observation for the dizziness Mr. Boyett claimed caused the fall.  Nurse McCoy

---

[118]*See Estelle*, 429 U.S. at 106.

treated every apparent medical need of Mr. Boyett at the time he saw him.  There is no evidence he delayed or denied medical treatment to Mr. Boyett.

The plaintiff complains Nurse McCoy failed to appropriately assess the cause of Mr. Boyett's fall.  However, even if Nurse McCoy negligently evaluated the cause of the fall, this would not suggest an Eighth Amendment violation.[119]  There is no evidence he had a "state of mind more blameworthy than negligence"[120] or that this alleged omission substantially harmed Mr. Boyett.  As with the rest of the medical staff, Nurse McCoy had no reason to suspect and, therefore, disregard an excessive risk to Mr. Boyett's health or safety with regard to Mr. Boyett's other alleged conditions or complaints.  Because no reasonable juror could find otherwise, the plaintiff's claims as to Nurse McCoy fail.

### 6.    Defendant Dave Patt

Similarly, Sgt. Patt's actions reveal no deliberate indifference to Mr. Boyett's medical needs.  In fact, there is no evidence in the record as to what, if any, direct contact Sgt. Patt had with Mr. Boyett.  The plaintiff alleges Sgt. Patt was responsible for the continued protocol that resulted in Mr. Boyett allegedly being over-medicated with Thorazine.  Even assuming this were the case, it does not show Sgt. Patt acted with deliberate indifference to Mr. Boyett's serious medical needs.  The plaintiff also argues Sgt. Patt should face liability for his alleged statement

---

[119]*Perkins*, 165 F.3d at 811.

[120]*Farmer*, 511 U.S. at 835.

that it would be "overkill" for medical staff to document every action they took.[121]  However, the record does not show any connection between this statement and any inadequate medical care of Mr. Boyett, nor does it suggest Sgt. Patt failed to provide for Mr. Boyett's medical care in any other way.  A reasonable juror could not find Sgt. Patt acted with deliberate indifference to Mr. Boyett's medical needs.

7.      Defendant Sabrina Steele

A reasonable juror also could not find PA Steele's actions reveal deliberate indifference to Mr. Boyett's medical needs.  PA Steele practiced at the correctional facility under the license of Dr. Burnham, pursuant to Utah Code Ann. § 58-70a-101, *et seq.*, and Utah Admin. Code R. 156-70a-101, *et seq.*  The State of Utah granted PA Steele an exemption from the requirement that her supervisor work on-site because she practiced in a rural area.  However, Dr. Burnham was available to address PA Steele's concerns twenty-four hours a day.

PA Steele's only contact with Mr. Boyett occurred September 1, 2003.  On this date, PA Steele evaluated Mr. Boyett and requested he advise her of his medical history.  Mr. Boyett indicated he suffered from alcohol withdrawal symptoms and was concerned about healing from his hernia surgery.  PA Steele prescribed 500 mg of Naprosyn twice daily and 25 mg of Elavil twice daily for Mr. Boyett's neck and back pain.  She prescribed 0.1 mg of Clonidine twice daily to treat his Methadone withdrawal.  She ordered liver function tests to be performed on Mr. Boyett and requested follow up as needed.  She evaluated his physical state and determined he

---

[121]Pl.'s Mem. in Opp'n to Officer Defs.' Mot. for Summ. J., Docket No. 148, Exh. 11, Smith Depo. 92.

had healed well from his surgery.  PA Steele also advised the jail medical staff to contact her if

they had questions about any of the inmates, including Mr. Boyett.  PA Steele appears to have

acted reasonably in her evaluation of Mr. Boyett.  There is no indication she acted negligently, let

alone with deliberate indifference.

There is also no evidence PA Steele possessed any knowledge of Mr. Boyett's other

alleged injuries or conditions such that § 1983 liability would be proper.  Mr. Boyett made no

complaints and exhibited no symptoms to PA Steele which would alert her to other medical

conditions.   PA Steele would need reason to know of "underlying facts indicating a sufficiently

substantial danger"[122] in order to be aware of an actual danger.  Without this awareness, PA

Steele cannot have been deliberately indifferent to Mr. Boyett's untreated medical needs.

Because the plaintiff has failed to produce evidence that any actions or omissions by PA Steele

reflected deliberate indifference, the plaintiff's claim against PA Steele fails.  Similarly, the

plaintiff has failed to establish Sheriff Smith's liability under § 1983.

## IV.   Claims Against Sheriff Smith — Failure to Properly Hire, Train, and Supervise; and Deficient Policies

The plaintiff contends Sheriff Smith is liable pursuant to § 1983 for failure to properly

hire, train, and supervise his employees, and for maintaining deficient policies.  The doctrine of

*respondeat superior* may not be used to hold a police supervisor liable pursuant to § 1983 for

misconduct of subordinate officers.[123]   A finding of fault on the part of the supervisor is

---

[122]*Farmer*, 511 U.S. at 844.

[123]*See McClellan v. Facteau*, 610 F.2d 693 (10th Cir. 1979).

necessary for a finding of liability.[124]

> [I]t is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation.  Instead, . . . the plaintiff must establish a deliberate, intentional act by the supervisor to violate constitutional rights.  In short, the supervisor must be personally involved in the constitutional violation and a sufficient causal connection must exist between the supervisor and the constitutional violation.[125]

A finding of supervisor liability is premised on the plaintiff establishing, first, that the supervisor's subordinates violated the Constitution.[126]  Next, the plaintiff must draw an affirmative link between the inferior officer's civil rights violation and the supervisor's acts or omissions.[127]  To create this link, the plaintiff must show the supervisor actively participated or acquiesced in the constitutional violations.[128]  "[T]he supervisor's state of mind is a critical bridge between the conduct of a subordinate and his own behavior" — the supervisor must have acted with knowledge, or at least deliberate indifference, that a constitutional violation would occur.[129]  Although it's somewhat difficult to glean from the sixty-six pages of facts in the plaintiff's motion, it appears the plaintiff is alleging Sheriff Smith should be held liable for the policies of the correctional facility, specifically:

---

[124]*Serna v. Colo. Dep't of Corrs.*, 455 F.3d 1146, 1151 (10th Cir. 2006).

[125]*Id.* (citations and internal quotations omitted).

[126]*Id.*

[127]*See Rizzo v. Goode*, 423 U.S. 362, 371 (1976).

[128]*Serna*, 455 F.3d at 1151; *Kite v. Kelley*, 546 F.2d 334, 337 (10th Cir. 1976).

[129]*Serna*, 455 F.3d at 1151.

> [t]he lack of proper records, the ignoring of the requirement of the need for prescriptions for Thorazine, the lack of evaluation of Boyett by a medical doctor after his alleged fall on September 3, 2003 when he exhibited symptoms of seizure, (and perhaps suffered fractured ribs and other injuries), the lack of evaluation of Boyett on September 5, 2003, when he received a head laceration that required stitches, the restraint by forcibly administered psychotropic drugs, the lack of medical attention, [and] the lack of supervision in the medical observation cell . . . .[130]

Whether these claims are based on failure to adequately supervise or train, or on maintenance of bad policies, the plaintiff has done nothing to establish the necessary deliberate act or affirmative link between Sheriff Smith and the alleged constitutional violations.

The plaintiff's claim against the sheriff fails at the outset because the plaintiff has not established any of Sheriff Smith's subordinates violated Mr. Boyett's constitutional rights. Without such a showing, the court cannot find Sheriff Smith was involved in any violation.[131] Even if the plaintiff had shown a subordinate officer violated Mr. Boyett's constitutional rights, it failed to show Sheriff Smith actively participated or acquiesced in any violation.  Sheriff Smith confirmed that no Washington County correctional facility policies had been breached relating to the custody or death of Mr. Boyett.  Further, none of the policies have been shown to be facially unconstitutional or to be likely to lead to violations of rights.

A.      *Failure to Train — Policies and Employee Qualifications*

With regard to failure to train, this case can be both compared to and distinguished from

---

[130]Pl.'s Mem. in Opp'n to Officer Defs.' Mot. for Summ. J., Docket No. 148, at viii.

[131]*See Serna*, 455 F.3d at 1151.

the Tenth Circuit's decision in *McClelland v. Facteau*.[132]  In *Facteau*, a number of police officers

and correctional officers beat and injured an inmate who had been booked into jail for traffic

violations.[133]  The court rejected the plaintiff's claims that the perpetrators' police chiefs were

directly liable due to breach of duties to train and supervise their subordinates.[134]  Specifically,

the court found a subordinate's act, contrary to policy, does not constitute sufficient causal

connection to hold a supervisor liable because it does not establish proof of wrongful policy or

lack of training.[135]  "Supervisors cannot automatically be held liable for a subordinate straying

from the established path."[136]  Only if the plaintiff had provided evidence of defective training or

procedures could he have prevailed on that claim.[137]

　　　　In this case, the plaintiff has failed to provide evidence of defective policies.  Although

the plaintiff has argued against the protocol allowing administration of Thorazine, it has not

shown this approach to be objectively wrongful.  Moreover, the plaintiff has made no showing

Sheriff Smith's state of mind was sufficient for liability — the record does not support an

inference that the sheriff acted with knowledge or deliberate indifference that a constitutional

---

[132]610 F.2d 693 (10th Cir. 1979).

[133]*Id.* at 695.

[134]*Id.*

[135]*Id.* at 695–96.

[136]*Id.* at 697.

[137]*Id.*

violation would result from the Thorazine policy.[138]   The plaintiff argues Sheriff Smith should

face liability for the inadequate medical records the correctional staff allegedly kept, especially in

light of Sgt. Patt's alleged statement that it would be "overkill" for medical staff to document

every action they took.[139]   This claim fails because Sheriff Smith had no knowledge of Sgt. Patt's

alleged statement until after Mr. Boyett's death.   Moreover, the plaintiff has failed to show that

any deficient records led to any harm to Mr. Boyett or any other inmates.   In absence of evidence

the allegedly deficient record-keeping caused harm, the plaintiff has failed to show a defective

policy existed or that Sheriff Smith acted indifferently to it.

        Just as there is no evidence of defective policies, there is no evidence of specific training

deficiencies.   A lack of training claim fails without proof Sheriff Smith made a conscious

decision to adopt a policy of not training or accepted a permanent and well-settled practice of not

training.[140]   A single incident of failure to train is insufficient to establish an actionable claim of

failure to train unless the incident is due to a facially unconstitutional policy.[141]   For example, the

two doses of Thorazine administered to Mr. Boyett within less than six hours, even if found to

spring from a failure to train, would not be actionable under § 1983 because the plaintiff has

presented no evidence it was based on a facially unconstitutional policy.   The plaintiff has failed

---

        [138]*See Serna*, 455 F.3d at 1151.

        [139]Pl.'s Mem. in Opp'n to Officer Defs.' Mot. for Summ. J., Docket No. 148, Exh. 11, Smith Depo. 92.

        [140]*Simmons v. City of Philadelphia*, 947 F.2d 1042, 1059 (3d Cir. 1991); *see also Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985).

        [141]*Tuttle*, 471 U.S. at 823.

to show the corrections staff was improperly trained or to point to any lack of training resulting in a violation of Mr. Boyett's rights.  The plaintiff focuses its claim of deficient training on PA Steele.  However, the plaintiff fails to provide evidence to support this claim.  PA Steele graduated from Emery University and had been practicing as a medical professional since she graduated.  Dr. Bruce Burnham supervised PA Steele at the correctional facility pursuant to a "rural exemption" granted by the State, and Dr. Burnham specifically approved of PA Steele's employment there.  The record does not support an inference PA Steele's or any other correctional staff member's training or qualifications were anything but adequate.

> B.      *Failure to Supervise — Inadequate Medical Care and Excessive Force*

The plaintiff has also failed to show Sheriff Smith should be held liable based on failure to supervise.  In *Facteau*, the Tenth Circuit found that liability for failure to supervise or correct misconduct requires the defendant to be "adequately put on notice of the prior misbehavior."[142] Whether a police chief is adjudged to have notice is evaluated using the standard of a reasonable person under the circumstances.[143]  The *Facteau* court found "[d]istant rumors that are too vague to prompt action by reasonable persons, or information that is reasonably believed to lack credibility do not provide sufficient notice."[144]  However, due to the various law suits pending against the cities and a police chief for previous inmate deaths, and due to the widespread news

---

[142]*Facteau*, 610 F.2d at 697.

[143]*Id.*

[144]*Id.*

coverage of similar inmate abuse, the court remanded this claim.[145]  The court surmised publicity

of police misconduct may have been so widespread and credible that the police chief defendants

may have known of the misconduct.[146]  If the police chiefs did possess such knowledge, it is

possible a trier of fact may find they should have and could have taken steps to prevent the

plaintiff's rights from violation.[147]

The facts of this case are a far cry from *Facteau*.  The plaintiff has failed to show Sheriff

Smith had sufficient notice of any misbehavior by corrections officials to be liable under § 1983

for failure to supervise.  The plaintiff presents the court with multiple suppositions — claims that

"if only" correctional staff had taken particular actions, then Mr. Boyett would not have died.

However, the record does not support an inference any one person could have taken any specified

act to prevent his death, let alone that failure to do so was rooted in deliberate indifference

sufficient to constitute a violation of Mr. Boyett's civil rights.  Even if all the plaintiff's "if, then"

contentions are meritorious, failure of correctional staff to take the plaintiff's suggested actions

does not establish that Sheriff Smith had notice of such widespread abuse to subject him to §

1983 liability.

With regard to medical care, there is no evidence jail personnel were deliberately

indifferent to Mr. Boyett's needs.  If anything, the record fully supports the opposite conclusion.

---

[145] *Id.*

[146] *Id.* at 698.

[147] *Id.*

In any event, Sheriff Smith had no reason to think Mr. Boyett's constitutional rights were violated and, indeed, they were not.  Medical staff treated Mr. Boyett's dizziness and injuries he sustained from a fall.  Nurse McKinnon recommended treatment for the constipation of which Mr. Boyett complained.  Nurse Hanson treated Mr. Boyett's head laceration.  A licensed clinical social worker treated him for psychotic behavior.  Medical staff treated Mr. Boyett for disorientation.  PA Steele prescribed substitutes for the Methadone Mr. Boyett had been taking for withdrawal.  PA Steele examined Mr. Boyett to assess the healing of his prior abdominal surgery — she found him to be well-healed and found no indication of internal bleeding.  PA Steele ordered liver function tests in response to Mr. Boyett's claims of a failing liver.  The only injuries and conditions the medical staff failed to treat are those of which Mr. Boyett never complained or exhibited symptoms.  Considering that the jail staff lacked knowledge of Mr. Boyett's untreated medical conditions, it is unreasonable to infer Sheriff Smith had notice any conditions were untreated.

The plaintiff brings the court's attention to a letter Mr. Boyett's sister, Ms. Brady, sent to the Washington County Attorney's Office expressing concern about Mr. Boyett's medical care.  However, the letter only warned of Mr. Boyett's need to stay on his prescribed medications; it did not inform the reader of any particular medical condition.  The letter, therefore, did not put correctional staff or Sheriff Smith "on notice" of any of Mr. Boyett's undiagnosed conditions or injuries.  Chief of Police Lambert forwarded Ms. Brady's letter to the correctional facility.  In an e-mail to Chief Lambert on September 3, 2003, Nurse McCoy outlined the staff's medical care of Mr. Boyett to that point.  The email explained Mr. Boyett had been given medication, attended to

by PA Steele, and given numerous opportunities to see medical staff.  If anything, this would convince a reasonable juror Sheriff Smith had reason to believe Mr. Boyett's medical needs were fully met.  Especially in light of the fact that the plaintiff offered no evidence of any prior instances of inadequate medical care relating to other inmates, this does not constitute actionable failure to supervise.

The plaintiff's references to excessive force similarly fail.  The plaintiff's contention that the photographs of Mr. Boyett's body establish injuries occurring due to assault is unsupported. Dr. Lies indicated the discoloration on the body was due to lividy and to facial plethora which occurs with sudden cardiac death.  The swelling around the eyes and scrotum resulted from gaseous expansion — a normal post-mortem decompositional change.  Dr. Leis explained no underlying physical injuries would produce that effect.  The court, therefore, cannot take the great inferential leap required to find that Sheriff Smith knew or should have known of excessive force perpetrated by his employees or by other inmates.  The court cannot draw this inference based on prior excessive force episodes either — Sheriff Smith terminated a guard for the only known incident of excessive force by a deputy at the facility, and it was completely unrelated to Mr. Boyett.  Unlike in *Facteau*, the plaintiff has failed to show widespread news coverage of inmate abuses at Purgatory Correctional Facility, or any other basis to impute knowledge to Sheriff Smith.

**V.  Claim Against Washington County — Municipal Liability**

The plaintiff appears to have taken a shotgun approach to its opposition to Washington County's motion for summary judgment, which makes its memorandum somewhat difficult to

navigate.  In essence, the plaintiff rests its argument on general allegations Washington County's

policies deprived Mr. Boyett of his constitutional rights including, specifically, the county's

alleged "policies" relating to failure to properly train its employees and failure to provide

adequate medical care.  The clearest arguments the court can glean from the plaintiff's

memorandum in opposition to summary judgment are those listed in its response to Washington

County's statement of facts.  In it, the plaintiff objects to Washington County's alleged policies

of:

> [1] administering prescription drugs; [2] of admitting inmates in need of medical
> care and treatment and not continuing their care; [3] of not allowing prescription
> drugs to be administered in the jail when the jail authorities did not know why the
> drugs were prescribed, what they were being used to treat, the nature of the
> aliment [sic] that required them to be prescribed, and the lack of review so that
> these questions could be answered and an alternative medication prescribed; [4]
> the failure to have a qualified medical staff; [5] the failure to have a medical
> doctor on staff or at the very least on call; [6] the failure to hire a qualified PA
> who operated under the license of a qualified medical doctor, not only in form but
> in substance, who was overseen on a day to day basis with proper and adequate
> review of the medical records and care; [7] of having part time medical assistance
> at a distance; [8] of having a policy of not preparing and providing accurate and
> organized medical records labeling it as "overkill"; [9] of hiring piecemeal
> temporary medical providers in order to cut costs and attempt to circumvent the
> constitutional protections required for the inmates; [10] the policy of having no
> visitors to pretrial detainees; [11] the policy of "no bail" warrants; [12] along with
> the facts setting forth the acts and omissions of hiring, training and supervision . .
> . .[148]

It is unclear whether the plaintiff offers these allegations in support of its failure-to-train

claim or its failure-to-provide-adequate-medical-care claim.  The court, therefore, has evaluated

---

[148]Pl.'s Mem. in Opp'n to Washington County's Mot. for Summ. J., Docket No. 151, at
iv–v.

the allegations where they best seem to fit.  Additionally, although the plaintiff's memorandum in opposition to the defendants' motion for summary judgment includes fifty-three pages of factual allegations, nowhere does the plaintiff advise the court which facts are offered in support of which claims.  After this litany of alleged "horribles" to which Mr. Boyett was supposedly subject, the plaintiff only devotes five pages to discussion, and the discussion largely consists of statements of law and legal conclusions.  In all of this, the plaintiff presents no evidence an official custom, policy, or lack of training caused a violation of Mr. Boyett's civil rights.

Parties may not use § 1983 suits to duplicate state tort law on a federal level.[149] Municipality liability is not established solely because an employee inflicts constitutional injury on another.[150]  To be liable, the governmental entity itself must be responsible for the injury through an act or edict that can fairly be said to represent official policy[151] — "[t]hat is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and deprivation of federal rights."[152]  When a policy is lawful on its face, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."[153]  Therefore, municipalities may only be held liable under § 1983 if the plaintiff

---

[149]*See Medina v. Denver*, 960 F.2d 1493, 1495 (10th Cir. 1992).

[150]*Monell v. New York City Dep't of Social Svcs.*, 436 U.S. 568, 694 (1978).

[151]*Id.*

[152]*Board of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

[153]*Id.* at 405.

establishes: (1) a municipal policy or custom existed, and (2) the policy or custom is directly and causally linked to the alleged injury.[154]  If the challenged policy consists of failure to act, such as failure to train, the plaintiff must establish "deliberate indifference" to the rights of municipality inhabitants caused the municipality's inaction.[155]  Also, in the absence of an underlying constitutional violation by a municipal official, the municipality may not be held liable.[156]

A.      *Failure to Provide Adequate Medical Care*

As discussed previously, deficient medical care may constitute a constitutional violation.[157]  However, the plaintiff must meet both the objective and subjective components by showing the medical deprivation was "sufficiently serious,"[158] and the defendant acted with a *mens rea* on par with criminal recklessness.[159]  At the outset, many of the plaintiff's claims fail because, as a matter of law, it has not presented evidence most of the challenged actions of Washington County constituted policies or customs sufficient to attach § 1983 liability.[160]  Moreover, even if such policies did exist, the plaintiff has not shown the policy or custom is

---

[154]*Canton v. Harris*, 489 U.S. 378, 385 (1989).

[155]*Id.* at 389.

[156]*Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Apodaca v. Rio Arriba County Sheriff's Dep't*, 905 F.2d 1445, 1447–48 (10th Cir. 1990); *Myers v. Okla. County Bd. of Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998).

[157]*Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

[158]*Farmer*, 511 U.S. at 834.

[159]*Id.* at 836.

[160]*See Canton*, 489 U.S. at 385.

directly and causally linked to medical care so deficient as to constitute a constitutional injury.[161]

> 1.    Alleged Policies — Administration of Medication and Disallowance of
>        Methadone

The plaintiff has flatly failed to identify *official* policies which might impose § 1983

liability.  An official policy is one made by lawmakers or by those whose acts or edicts may fairly

be said to represent official policy.[162]  The court first addresses the two courses of conduct that

may qualify as unofficial policies — the administration of prescription drugs and the

disallowance of Methadone use in the jail.  The court believes this conduct corresponds to the

plaintiff's alleged policies of "[1] administering prescription drugs"[163] and

> [3] of not allowing prescription drugs to be administered in the jail when the jail
> authorities did not know why the drugs were prescribed, what they were being
> used to treat, the nature of the aliment [sic] that required them to be prescribed,
> and the lack of review so that these questions could be answered and an
> alternative medication prescribed . . . .[164]

Washington County jail officials' administration of medications to inmates may

constitute an actual policy because the jail had medical personnel on staff specifically to provide

this type of medical care.  PA Steele is trained and licensed to give medication.  She prescribed

the Clonidine, Elavil, Haldol, and Napryson administered to Mr. Boyett.  And although Ms.

Steele did not prescribe the Thorazine, jail staff administered it pursuant to a physician's standing

---

[161] *See id.*

[162] *Monell*, 436 U.S. at 694.

[163] Pl.'s Mem. in Opp'n to Washington County's Mot. for Summ. J., Docket No. 151, at iv.

[164] *Id.*

order or protocol.  However, even if this establishes Washington County had a policy of administering medications, there was nothing unconstitutional about administering these medications to Mr. Boyett.  Because inmates lack access to many outside resources, jails have a responsibility to provide inmates with medication,[165] and nothing indicates jail officials administered medication to Mr. Boyett without his consent or using force.

The plaintiff seems to object the most to the administration of Thorazine to Mr. Boyett. The court has already determined administering Thorazine to Mr. Boyett did not violate his civil rights.[166]  The plaintiff elevates its challenge to the Thorazine administration by pointing out jail staff recorded having given Mr. Boyett two 100 mg doses of Thorazine on September 5, 2003, each within less than six hours of the other.  However, as discussed previously, any mistake in dosage constitutes medical negligence at most — there is no indication the participants had a criminally reckless *mens rea*.  Further, in the autopsy of Mr. Boyrtt's body, Dr. Leis found no elevated levels of any medication, including Thorazine.

Washington County also arguably had a policy of disallowing Methadone use in the jail. PA Steele referred to a protocol disallowing narcotics, and Methadone is a narcotic.  PA Steele described the concerns with allowing such narcotics in the jail: "the patient would be beaten or abused by other inmates in order to get that methadone."[167]  She explained inmates will even

---

[165]*Farmer*, 511 U.S. at 832.

[166]*See* Order Granting Washington County Defs.' Mots. for Summ. J., Docket No. 120, at 11 (Apr. 26, 2006).

[167]Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., Docket No. 148, Exh. 5, at 96.

force others to vomit Methadone pills given by medical personnel.  According to PA Steele, individuals do not die solely because they do not receive their prescribed Methadone.  Also, Washington County did not leave Mr. Boyett without recourse; as substitutes for Methadone, PA Steele prescribed Elavil and Napryson.  There is no evidence negating the appropriateness of prescribing substitute medications to mimic Methadone's effect on the body.  Even if PA Steele had not prescribed these alternatives, Nurse Hanson clarified that at the low levels of Methadone Mr. Boyett was receiving, withdrawal was not a major concern.  In this case, the court finds Mr. Boyett had no constitutional right to Methadone treatment.  Other courts have reached similar conclusions.[168]  Even if the court had found Methadone treatment to constitute a constitutional right, the plaintiff has failed to establish Washington County personnel acted with deliberate indifference to this right; a necessary finding for a constitutional violation based on deficient medical care.  Instead, PA Steele took special care to address Mr. Boyett's Methadone treatment issues.

### 2.    Alleged Medical Customs

With regard to the remainder of the plaintiff's medical-based allegations, the plaintiff provides no evidence jail officials' actions stemmed from jail or county policies.  For example, nowhere in the record did the plaintiff present evidence of a Washington County policy mandating employees to discontinue needed medical care.  The only way Washington County may be liable in absence of official policy is if its employees' actions reflect customs or decisions

---

[168]*See, e.g.*, *Holly v. Rapone*, 476 F. Supp. 226, 230 (E.D. Pa. 1979).

sufficient to bring Washington County under the reach of § 1983.  The court, therefore, assumes

the plaintiff bases the remainder of its claims on the existence of customs.  A custom is

something that lacks formal approval, but constitutes such a permanent, well-settled, and

widespread practice so as to have the force of law.[169]

The plaintiff accuses Washington County "of admitting inmates in need of medical care

and treatment and not continuing their care."[170]  There is no evidence this was a sufficiently

widespread practice to constitute a custom.  In fact, there is no evidence Washington County

discontinued necessary medical care of any inmates, including Mr. Boyett.  Before booking Mr.

Boyett in jail on August 20, 2003, the arresting officer took him to Dr. Tremea, a physician who

medically cleared him for incarceration.  Dr. Tremea diagnosed Mr. Boyett with recent

abdominal surgery and alcohol intoxication, and his only recommendation for follow-up

treatment was that Mr. Boyett continue Methadone treatment and be observed for withdrawal

symptoms.  The plaintiff complained police officials did not have Mr. Boyett medically cleared

before incarcerating him again on August 27, 2003, but the plaintiff points to no reason police

officials should have sought such clearance.  Mr. Boyett himself indicated his medical history

was the same on August 27, as when he was booked on August 20.  There is no indication he was

admitted to jail while in need of medical care.  A reasonable juror would not expect corrections

---

[169]*Monell*, 436 U.S. at 691; *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003).

[170]Pl.'s Mem. in Opp'n to Washington County's Mot. for Summ. J., Docket No. 151, at iv.

officials to diagnose medical needs a physician failed to recognize, especially when the inmate himself was silent as to any needs.  Other than the discontinuation of Methadone treatment addressed above, the record evidence does not support an inference Washington County failed to continue any medical treatment begun before Mr. Boyett's incarceration.

The plaintiff has presented evidence some doses of the medications PA Steele prescribed for Mr. Boyett while in jail were not recorded as being administered.  However, the plaintiff fails to establish neglecting to administer prescribed medications was sufficiently widespread to constitute a custom.  And even assuming it was a custom, evidence of deliberate indifference to serious medical needs is required to establish a § 1983 claim for inadequate medical care.  Assuming Mr. Boyett was denied these unrecorded doses of medication, the plaintiff has not presented medical evidence these omissions were based in deliberate indifference such that they constituted a violation of Mr. Boyett's due process rights.  The evidence also fails to support an inference that missing a few doses of medication constituted the denial of a serious medical need.

Moreover, the evidence fails to support an inference jail officials failed to treat any complaints or medical conditions of which they were aware.  In fact, jail officials appear to have taken particular care to address any complaints of which they had knowledge.  After Mr. Boyett fell on September 3, 2003, he complained of dizziness.  Nurse McCoy treated Mr. Boyett for this complaint.  He also treated the laceration on Mr. Boyett's forearm, sustained as a result of his fall.  Mr. Boyett complained of constipation, so Nurse McKinnon evaluated Mr. Boyett and recommended a course of treatment.  Mr. Boyett sustained a laceration to his head on September 5, 2006.  Nurse Hanson evaluated the injury and treated it.  When Mr. Boyett became disoriented

and seemed to have some mental difficulties, Mr. Wolton, a licensed clinical social worker,

evaluated Mr. Boyett; he looked at the possibility of a pyschotic episode and assessed the risk of

danger Mr. Boyett posed to himself.  Based on the assessment of Mr. Boyett's risk of self-harm,

the jail staff administered Thorazine to Mr. Boyett.  The staff also transferred Mr. Boyett to a

medical observation cell, where he could be constantly observed.  Mr. Boyett was evaluated for

his withdrawal symptoms and was given medication to treat them.  PA Steele also prescribed

substitute medications for the Methadone Mr. Boyett had been taking.  At one point, Mr. Boyett

claimed to be internally bleeding due to hernia surgery.  PA Steele examined him, finding Mr.

Boyett had recovered from his surgery and finding no indication of internal bleeding.

Additionally, Mr. Boyett claimed he had a bad liver.  PA Steele examined him and ordered liver

function tests to be done.  It is clear Washington County did not repeatedly ignore the plaintiff's

requests; instead, Mr. Boyett was seen by medical personnel on numerous occasions in relation to

complaints.  It is difficult to distill a policy or custom of refusing medical treatment to Mr. Boyett

where Washington County never refused to treat problems of which they were aware.

     If, with its allegation Washington County failed to provide needed continuing care, the

plaintiff is arguing Washington County is subject to § 1983 liability for failing to treat medical

conditions of which jail officials were unaware, the plaintiff's claim still fails.  The court cannot

find a policy or custom of refusing to provide medical care where Mr. Boyett never requested it

and Washington County was unaware of the need.  And even if this custom existed, it is not

enough to allege Washington County should have known of Mr. Boyett's injuries; the plaintiff

failed to show jail officials were both "aware of the facts from which the inference could be

drawn that a substantial risk of serious harm exists," and *actually drew the inference*.[171]  The

record does not establish Mr. Boyett ever complained of problems or exhibited symptoms from

which an inference could be drawn that he suffered from untreated serious medical needs.  And,

the plaintiff has not provided evidence jail officials actually drew inferences Mr. Boyett suffered

such ailments.   To the extent the plaintiff argues against Washington County's failure to

diagnose these injuries or to refer Mr. Boyett to a medical doctor even though they lacked

knowledge of these conditions, its claims also fail.

> [T]he question whether an X-ray — or additional diagnostic techniques or forms
> of treatment — is indicated is a classic example of a matter of medical judgment.
> A medical decision not to order an X-ray, or like measures, does not represent
> cruel and unusual punishment.  At most it is medical malpractice, and as such the
> proper forum is the state court . . . .[172]

The plaintiff has not shown the jail officials' treatment modalities violated Mr. Boyett's

constitutional rights.  Instead, the plaintiff's claims sound in negligence — a standard that does

not give rise to municipal § 1983 liability.  For example, the plaintiff cites "reasonable medical

standards of care" and alleges employees of Washington County violated those standards.[173]

From the plaintiff's own description of events, it is clear Mr. Boyett received extensive medical

care and jail officials were not indifferent to his needs.  Mr. Boyett's exact cause of death

constitutes a disputed fact but it is immaterial in the sense that regardless of the cause of death,

---

[171]*Farmer*, 511 U.S. at 837.

[172]*Estelle*, 429 U.S. at 107.

[173]*See, e.g.*, Pl.'s Mem. in Opp'n to Washington County's Mot. for Summ. J., Docket No. 151, at xxvi.

the plaintiff has failed to demonstrate the propriety of attaching § 1983 liability to Washington County.  As discussed with regard to Sheriff Smith, even if all the plaintiff's "if only" claims were meritorious, failure of correctional staff to follow the plaintiff's recommended courses of action does not constitute a civil rights violation — there is simply no evidence any defendants drew inferences that Mr. Boyett suffered from untreated serious medical conditions.  Therefore, the plaintiff's claim Washington County maintained unconstitutional customs of not treating medical needs does not survive summary judgment.

### B.    *Failure to Properly Train or Hire, and Other Challenged Policies*

Although the plaintiff alleges Washington County generally failed to train its employees and hired unqualified individuals, there is no evidence of any acts or omissions of constitutional proportion with regard to hiring or training or with regard to Washington County's other non-medical policies.

### 1.    Failure to Train

As with failure to provide adequate medical care, Washington County may only be held liable under § 1983 for providing inadequate training or failing to train if: (1) a municipal policy or custom existed, and (2) the policy or custom is directly and causally linked to the alleged constitutional injury.[174]  "A supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that

---

[174]*Canton*, 489 U.S. at 385.

future misconduct is almost inevitable."[175]  To be a policy or custom actionable under § 1983, this failure to train must evidence deliberate indifference to the rights of the municipalities' inhabitants[176] — "i.e., the failure to train must reflect[] a deliberate or conscious choice by a municipality."[177]

The plaintiff can establish deliberate indifference by presenting evidence Washington County had "actual or constructive notice that its action or failure to act [was] substantially certain to result in a constitutional violation, and it consciously or deliberately [chose] to disregard the risk of harm."[178]  This notice may be "established by proving the existence of a pattern of tortious conduct."[179]  In a "'narrow range of circumstances,' however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction."[180]

Even identified deficiencies in a training program "must be closely related to the ultimate

---

[175]*Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988) (citation omitted).

[176]*Pembaur v Cincinnati*, 475 U.S. 469, 483–84 (1986); *Canton*, 489 U.S. at 387.

[177]*Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation and internal quotations omitted).

[178]*Id.* (citing *Brown*, 520 U.S. at 407).

[179]*Id.*

[180]*Id.* at 1308 (citing *Brown*, 520 U.S. at 409; *Canton*, 489 U.S. at 390 & n.10)).

injury."[181]  The court must assess whether the injury would have been avoided if the employee

were trained in a program not deficient in the identified respect.[182]  Also, "[c]ulpability requires a

strong connection between the background of the particular applicant and the specific

constitutional violation alleged."[183]

> That a particular officer may be unsatisfactorily trained will not alone suffice to
> fasten liability on the city, for the officer's shortcomings may have resulted from
> factors other than a faulty training program.  Neither will it suffice to prove that an
> injury or accident could have been avoided if an officer had had better or more
> training, sufficient to equip him to avoid the particular injury-causing conduct.
> And plainly, adequately trained officers make mistakes; the fact that they do says
> little about the training program or the legal basis for holding the city liable.[184]

In this case, the plaintiff incorporates an allegation of failure to train: "[12] along with the

facts setting forth the acts and omissions of hiring, training and supervision . . . ."[185]  However,

other than the plaintiff's allegation "[8] of [Washington County] having a policy of not preparing

and providing accurate and organized medical records labeling it as 'overkill,'"[186] the plaintiff

has not identified any specific deficiencies in Washington County's training program.  The

plaintiff's claim with regard to this single, identified deficiency fails as there is no evidence

Washington County had a policy or practice of maintaining disorganized or false medical records

---

[181]*Canton*, 489 U.S. at 391.

[182]*Id.*

[183]*Barney*, 143 F.3d at 1308.

[184]*Canton*, 489 U.S. at 391.

[185]Pl.'s Mem. in Opp'n to Washington County's Mot. for Summ. J., Docket No. 151, at v.

[186]*Canton*, 489 U.S. at 391.

or that any problems had previously occurred alerting Washington County to any inadequacies in

its record-keeping.  And there is no evidence establishing what, if anything, jail officials failed to

document in Mr. Boyett's medical records, or how any alleged failure to document harmed Mr.

Boyett, much less resulted in a violation of his civil rights.  Further, there is no evidence anyone

in a policymaking position was aware of any record-keeping problems prior to Mr. Boyett's

death.

     Without identified deficiencies, it is impossible for the court to determine the degree of

connection between the deficiencies and the injury.[187]  The record does not support an inference

any employees lacked the necessary qualifications, experience, or instruction to do their jobs; nor

does it support an inference Washington County failed to hold training meetings or continuing

education.  Further, there is no indication jail employees failed to discuss emerging issues with

each other or lacked familiarity with necessary policies.  While the plaintiff obviously disagrees

with the actions jail officials took and choices they made, such disagreement does not constitute

an identified deficiency in training.

     Moreover, the plaintiff has failed to establish a pattern of tortious conduct sufficient to

support a finding of deliberate indifference.  Instead, the plaintiff seems to imply that the very

fact of Mr. Boyett's death necessarily suggests jail officials were inadequately trained.  However,

even assuming jail officials erred in their treatment of Mr. Boyett, "officers who are well trained

---

[187]*See id.*

are not free from error."[188]  The court cannot infer inadequacy of training solely from mistakes

jail officials allegedly made.  Additionally, this case does not fall within the narrow range of

circumstances justifying a finding of deliberate indifference absent a pattern of constitutional

violations.  Put simply, the plaintiff has not shown a violation of constitutional rights was a

highly predictable or obvious result of any acts or omissions in training by Washington County.

For these reasons, the court finds the plaintiff has not sustained its burden of showing

Washington County's training to be constitutionally inadequate.

### 2. Inadequate Hiring

Municipality liability pursuant to § 1983 in the hiring context requires the court to find

"*this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff."  Showing

only a municipal officer scrutinized an applicant with less than sufficient care will not meet the

"rigorous requirements of 'deliberate indifference.'"[189]

The plaintiff challenges Washington County's "policies" of

[4] the failure to have a qualified medical staff; [5] the failure to have a medical
doctor on staff or at the very least on call; [6] the failure to hire a qualified PA
who operated under the license of a qualified medical doctor, not only in form but
in substance, who was overseen on a day to day basis with proper and adequate
review of the medical records and care; [7] of having part time medical assistance
at a distance . . . [9] of hiring piecemeal temporary medical providers in order to
cut costs and attempt to circumvent the constitutional protections required for the
inmates . . . .[190]

---

[188]*Id.*

[189]*Barney*, 143 F.3d at 1308 (citing *Brown*, 520 U.S. at 412).

[190]Pl.'s Mem. in Opp'n to Washington County's Mot. for Summ. J., Docket No. 151, at v.

The court believes these alleged failures best fit an inadequate hiring claim.  But the evidence in the record fails to support an inference Washington County's hiring was so inadequate § 1983 liability should attach.

The plaintiff presented no evidence Washington County hired any unqualified individuals.  Each member of the jail's medical staff was licensed in accordance with state law, which means each individual complied with training, educational, and other requirements to practice in their professions.[191]  In particular, no evidence suggests PA Steele was unqualified for her job.  A reasonable factfinder cannot say it was unreasonable for Washington County to rely on the training and experience of a state-licensed physician's assistant working under the license of a medical doctor who was available to answer her calls twenty-four hours a day.  It was similarly reasonable for Washington County to rely on the rest of its state-licensed medical staff.  The plaintiff has failed to establish that a medical doctor is required to be on staff at jails or that failure to hire an on-staff doctor constituted deliberate indifference.

There is also no indication it is a legal requirement for a physician or physician's assistant be on-staff at correctional facilities.  And Washington County's correctional facility did maintain a medical staff on-site consisting of Sergeant Patt, Nurse Hanson, Nurse McCoy, Nurse McKinnon, Nurse Hummer, and LCSW Worlton.  PA Steele supplemented this on-site medical staff with weekly visits.  Further, PA Steele was on-call to address any of the medical staff's

---

[191]*See* Utah Code Ann. §§ 58-31b-101, *et seq.* (Nurse Practice Act); *id.* §§ 58-60-201, *et seq.* (Social Workers' Licensing Act); *id.* §§ 58-70-101, *et seq.* (Physician Assistant Act).

questions or concerns regarding inmate treatment.  The allegations Washington County hired

piecemeal temporary medical providers to cut costs and circumvent constitutional protections are

unsupported.  The plaintiff has not shown deliberate indifference by Washington County as it

pertains to hiring.

> 3.    Other Challenged Policies

The plaintiff's remaining claims fail to rise to the level of actionable § 1983 violations

also.  The plaintiff alleges a policy of not allowing visitors for pretrial detainees constituted a

violation of Mr. Boyett's constitutional rights.  However, the right to prison visitors is not a

constitutional right.[192]  Rather, jail officials have reasonable discretion over jail visitation

privileges.[193]  Also, it is inaccurate to say Washington County espoused a policy of  disallowing

jail visitors.  The policy required potential visitors to undergo background checks.  This policy

may delay visitation for a few weeks for some potential visitors, but the time frame is often

shorter.  The plaintiff has not established this policy was unreasonable or caused constitutional

injury to Mr. Boyett.

The plaintiff also objects to Washington County's alleged policy of issuing "no-bail"

warrants.  However, there is no indication such a policy would be unconstitutional.  And,

Washington County had no such policy; the District Court issued the no-bail warrant in Mr.

Boyett's case.  Judge James L Shumate issued an arrest warrant for Mr. Boyett due to charges of

---

[192]*See N.E.W. v. Kennard*, 952 F. Supp. 714, 719 (D. Utah 1997).

[193]*Id.*

driving under the influence, driving without insurance, driving on a suspended license, and failing to register his vehicle.  Judge Eric Ludlow issued an arrest warrant for Mr. Boyett due to similar violations arising from a different incident.  There is no evidence Washington County employees were meaningfully involved in the issuance process or possessed control or influence over the type of warrants the judges issued.  Finally, there is no evidence the issuance of no-bail warrants violated Mr. Boyett's constitutional rights.  For these reasons, the court grants the defendants' motions for summary judgment.

## VI.     Motion to Correct Mistake

Upon review, the court denies Plaintiffs' Motion to Correct Mistake.  In its motion, the plaintiff argues the court intended to wait until the close of expert discovery before ruling on Mr. Keil and Mr. Worlton's motions for summary judgment.  However, this argument does not accurately reflect the court's intent.  At the hearing, in response to a query as to whether the two summary judgment motions would be held under advisement until the close of expert discovery, the court said: "I'll take them under advisement until I've decided that I have sufficient information to rule."[194]

This is exactly what occurred — only after review of Roger Clark's expert report, submitted on March 31, 2006, did the court grant summary judgment to Mr. Keil and Mr. Worlton.  Nothing in the report changed the court's opinion that a grant of summary judgment was appropriate.  Later, after the completion of expert discovery, the court again reviewed its

---

[194]Mot. for Summ. J. Hr'g Tr. 28, Mar. 30, 2006, Docket No. 126.

prior ruling with regard to Mr. Keil and Mr. Worlton.  The court continues to feel confident in

the propriety of its prior order — the evidence on the record shows this ruling to be correct.  The

court, therefore, denies Plaintiffs' Motion to Correct Mistake.

<u>**CONCLUSION**</u>

Based on the foregoing, the court GRANTS the defendants' motions for summary

judgment [#135, #133, #141].  Further, the court DENIES the plaintiff's Motion to Correct

Mistake [#127] and finds the plaintiff's motion for a hearing on that issue to be MOOT [#129].

The court finds the challenges to expert testimony to be valid with regard to Dr. William Keith

Lara, Dr. Eugene Strayhorn, Dr. Frederick Lovell, and Joseph Kasperick.  The court, therefore,

GRANTS the defendants' motions with regard to these experts [#176, #174, #165].

Additionally, the court GRANTS the defendants' motion to strike the testimony of Dr. Wallace

Graham, in part [#163], but DENIES the plaintiff's motion to strike the testimony of Dr. Edward

Lies [#168].  Based on the outcome of this order, the motions to strike the testimony of Roger

Clark and Rudy Riet are MOOT [#170, #172].  The clerk's office is directed to close the case.

DATED this 28 day of November, 2006.

BY THE COURT:

_____

Paul G. Cassell
United States District Judge